Norman M. LITTELL, Plaintiff,

v.

Stewart L. UDALL, Secretary of the
Interior, Defendant.

No. C. A. 2779-63.

United States District Court
District of Columbia.

May 26, 1965.

Frederick Bernays Wiener, John F. Doyle, Washington, D. C., for plaintiff.

Herbert Pittle and Thomas L. Mc-Kevitt, Attys., Dept. of Justice, Washington, D. C., for defendant.

SIRICA, District Judge.

The plaintiff in this action is General Counsel and Claims Attorney for the Navajo Tribe. The Tribe has a population of approximately 100,000 members and occupies a reservation in Arizona, New Mexico, Utah and Colorado of approximately 24,000 square miles. It has extensive resources, including approximately $80,000,000 on deposit in the United States Treasury, and has a monthly income from mineral leases of approximately $1,000,000.

The defendant Secretary and his subordinates are restrained, by a preliminary injunction issued by Judge McGarraghy of this Court on November 29, 1963, from terminating plaintiff's contract with the Navajo Tribe; from suspending or otherwise improperly interfering with plaintiff's performance of said contract; or from withholding payments due thereunder. Defendant appealed from Judge McGarraghy's ruling; the Court of Appeals for this Circuit affirmed, 338 F.2d 537 (Aug. 13, 1964, petition for rehearing denied, Oct. 16, 1964). This Court is now asked to decide whether a permanent injunction should be issued.

As background, the following facts are relevant:

Mr. Littell has been General Counsel and Claims Attorney for the Navajo Tribe since August of 1947. Since that time, the Tribe's economic status has risen from a position of poverty to that of prosperity, largely due to discovery of vast mineral resources on the reservation. Plaintiff's duties have materially increased as the complexity of the Tribe's legal problems have multiplied with its increasing wealth. Correspondingly, his annual retainer as General Counsel has been raised from $5,000 beginning in 1947, to a present figure of $35,000. He has as yet received no fee for claims work during this period.

Plaintiff negotiated a ten-year contract in 1947 with the Navajo Tribal Council, the governing body of the Tribe, and renewed it for another ten years in 1957 after a short interim agreement. Pursuant to 25 U.S.C. § 81, the Secretary of the Interior, or his authorized representatives, have approved these contracts and the several amendments thereto.

Until early 1963, relations between attorney and client were cordial. Then, in a hotly-contested campaign for the office of Navajo Tribal Chairman, which is the Chief Executive position of the Tribe, this relationship became subject to considerable stress and strain. The successful candidate, Raymond Nakai, had promised during the campaign to remove plaintiff from his position. Mr. Nakai campaigned for the office of Navajo Tribal Chairman primarily on a platform "to get rid of Mr. Littell." He advocated less interference by the plaintiff in tribal affairs and also charged that the plaintiff had misrepresented to the Tribe the result in the Navajo-Hopi boundary dispute involved in Healing v. Jones. The nature of the dispute is discussed infra.

Nakai was elected Chairman in March of 1963 and was inaugurated the next month. Even before his inauguration, Nakai visited the Secretary and sought his help in eliminating Littell.

Subsequent meetings were held in the next two months. With the cooperation of several collaborators, some of whom were attorneys with an obvious self-interest to pursue in securing lucrative legal positions with the Tribe, Nakai succeeded

in gaining the confidence of the Secretary and his subordinates.

An old friend of the Secretary, one Barry DeRose, an Arizona attorney, was one of the collaborators. On June 14, 1963, he boasted that he could contact the Secretary "at any time." On June 18, DeRose phoned the Secretary's office for an appointment. Just one day later, he was in the Secretary's office. Several other persons opposed to Littell were present. At this meeting, the Secretary could have guided the dispute back to the limits of propriety by urging airing of it before the Tribal Council. Instead, he unwisely counseled that the charges against Littell should be expressed in a resolution passed by the nine-man Advisory Committee, a group appointed by Nakai, beholden to him, and quite prepared to rubberstamp anything he wanted. The result was an attempt to cloak this whole plan to eliminate Littell with the guise of legitimacy by getting a resolution passed by Nakai's hand-picked puppet committee.

Apparently, the Secretary preferred to accept the word of the Advisory Committee, which he himself described as a "stacked body," rather than submit the dispute to the duly-elected Tribal Council, representing all 100,000 Navajos on the reservation. He followed this course despite a written protest to him by several members of the Council concerning the circumvention of the Council.

The resolution was adopted by the Advisory Committee on June 25, 1963. There followed a concerted effort to "get rid of Littell" as General Counsel and Claims Attorney.

There was, however, a major obstacle to removal of the plaintiff. The 1957 contract provided that the termination of that contract could be accomplished only by the 74-member Tribal Council. It is clear that the majority of the Council membership was opposed to termination.

To detour this legal roadblock, the Secretary decided in November of 1963 that he himself should remove Littell. By a letter dated November 1, the Secretary transmitted to the plaintiff copies of two memoranda prepared by Frank J. Barry, the Secretary's Solicitor (the nature of the charges of alleged misconduct contained in the two memoranda are discussed *infra* in the section dealing with the defendant's assertion that the plaintiff has sought equitable relief with unclean hands). In the Secretary's letter of November 1 to plaintiff, he said:

"The conclusions which arise from the findings and conclusions in the memoranda mentioned above leave me no recourse but to take the following action:

"(a) Your personal performance under the Attorney Contract of the Navajo Tribe dated October 8, 1957, as amended, is hereby suspended;

"(b) Your contract will be terminated as of December 1, 1963, unless, in the interim, you can adduce convincing evidence that the conclusions justifying suspension and termination are unwarranted; and

"(c) Approval of said contract and all amendments thereto, insofar as such approval relates to your personal performance and right to compensation, is hereby rescinded and withdrawn. Furthermore, I have directed that no payments be made to you under said contract until further notice."

Plaintiff then filed this action. Judge McGarraghy's preliminary injunction followed on November 29, 1963. It prohibited the Secretary or his subordinates from terminating or suspending or improperly interfering with the plaintiff's performance under said contract, and further enjoined the Secretary's withholding of voucher approvals for monthly salary payments.

Within a few weeks, the regular quarterly meeting of the Navajo Tribal Council was held in Window Rock, Arizona. A further interference with the plaintiff's

duties occurred when he was ejected from the meeting by Chairman Nakai with the tacit approval of several of the people present, including employees of the Bureau of Indian Affairs, an arm of the Interior Department, and one Stanley Zimmerman, the personal representative of the Secretary and Barry. The plaintiff moved to cite the Secretary and Zimmerman for contempt, alleging that the Secretary and his officers, agents, and employees, including Zimmerman, violated the terms of the injunction in that they confederated and conspired with divers others persons to prevent plaintiff from acting as General Counsel for the Navajo Tribe. The evidence available to this Court at the time of the hearing (March 1964) of that motion failed to prove such a conspiracy in a manner that was "clear and convincing," and the Court denied the motion. The Court's oral opinion, rendered at the conclusion of the contempt hearing, is included as Appendix I. At this point, it might be noted that if all of the evidence that was introduced by both parties in the present action had been available for the Court's consideration at the contempt proceeding, the conclusion reached by the Court in that case undoubtedly would have been different.

Following the affirmance of Judge McGarraghy's preliminary injunction by our Court of Appeals, Udall v. Littell, supra, the defendant filed an answer and the hearing on the merits for a permanent injunction was held.

Attached hereto as Appendix II are the Court's findings of fact and conclusions of law.

The Court will now comment upon the principal legal issues raised in this case, namely:

(1) Did the Secretary have the legal authority to terminate the contract?

(2) Did the plaintiff exhaust his administrative remedies?

(3) Does the plaintiff seek equitable relief with unclean hands?

## I.

## DID THE SECRETARY HAVE THE LEGAL AUTHORITY TO TERMINATE THE CONTRACT?

■ The crucial question to be determined, if it has not already been decided by the Court of Appeals, Udall v. Littell, supra, is whether or not under the circumstances of this dispute, with the language of plaintiff's contract providing for termination only by the Tribal Council, the Secretary had the power to himself terminate the plaintiff's contract. Paragraph 12 of the current contract reads as follows:

"12. *Termination:* (a) The Tribal Council may terminate this contract *for good cause shown* in respect to any one or all of second parties' services as General Counsel after giving sixty days' notice to any of second parties in respect to which termination is sought, *the said termination to become effective upon approval* of the Commissioner of Indian Affairs, PROVIDED, HOWEVER, that in the event of *disagreement between the parties as to the sufficiency of the cause, the question shall be submitted to the Secretary of the Interior.* In such event, the parties of the second part or any one of them so terminated, shall receive compensation on the basis of the annual retainer provided for in Paragraph 4, above, prorated to the date of termination, together with such sums as may be properly due for expenses incurred prior to the date of termination; PROVIDED, FURTHER that if the services of Norman M. Littell or C. J. Alexander as General Counsel are so terminated by request of first party, the said Littell and Alexander and their assigns, if any, shall have the option to terminate the contract in its entirety, subject, however, to the provisions of Paragraph (b) hereof." (Emphasis added.)

The Court of Appeals in connection with this issue said:

"We have been shown no basis upon which the Secretary rather than the Tribal Council might declare the contract at an end. We have discovered no source of power—and none has been cited to us—which vests in the Secretary a predicate for rescission by him of his previous approval granted pursuant to 25 U.S.C. § 81 (1958)."

Since the majority withheld any opinion "on the merits" of the case, ibid, and since the "merits" may mean either the issue of the power of the Secretary to cancel the contract or the issue of unclean hands or both, this Court feels that it can only consider the Court of Appeals' opinion as holding that Judge McGarraghy did not abuse his discretion by issuing a preliminary injunction.

However, the Court of Appeals did note that "the District Court clearly contemplated that the Secretary simply lacked authority to terminate the Attorney Contract in the manner attempted and to rescind his earlier approval of the contract and the amendments thereto." (ibid.)

This language refers to the following conclusion of law made by Judge McGarraghy:

"5. The action taken by the defendant Secretary on November 1, 1963, and the further action imminently threatened to be taken by him on December 1, 1963, violates the rights of the plaintiff under his approved contract with the Navajo Tribe, and are in excess of any power or authority vested in the defendant Secretary by law."

During the hearing on the application for a permanent injunction, defendant cited no legal authority to support his position that he had the power to suspend and terminate the contract and to rescind his previous approval of the contract and its amendments.

The Secretary has cited many cases which hold in effect that he is the legal guardian of the Indians. But the Court cannot find in any of these cases a basis for holding that the Secretary could suspend, terminate, or rescind approval of this contract. The Secretary admits that he has never done it before. (Defendant's Reply Brief, p. 2.) Moreover, the memorandum from Solicitor Barry to the Secretary (page 209 of Plaintiff's Exhibit A), prepared by the Solicitor shortly before the October 11, 1963 meeting of plaintiff and the Secretary in the latter's office, informed the Secretary in unambiguous language that "it is clear that authority to act effectively for the Navajo Tribe with respect to the employment of an attorney under 25 U.S.C. § 81 is *lodged in the Navajo Tribal Council.* The Advisory Committee of the tribal council has *no authority* to speak effectively for the tribe in such matters." (Emphasis added.) After suggesting that an examination of tribal records should be made, the Solicitor gave the following advice:

" * * * Should the examination and audit of the records disclose the unauthorized diversion of general counsel services, it is our opinion that *all remedies available to the tribe* should be pursued. The tribe is certainly not obligated to pay twice for legal services incident to the claims work or to pay in any way save as provided by valid contract. Any contingent fee due under the contract would be subject to offset so as to reimburse the tribe for any unauthorized payments made to general counsel staff attorneys for claims work.

"Another action available to the tribe upon the discovery of unauthorized payments would be to invoke the cancellation provisions of the contract, and in such event you would be fully justified in approving *the action of the tribal council.* Indeed, if unauthorized payments are discovered you would be fully justified in initiating the cancellation procedure by recommending *tribal.*

*council action,* if you desire to do so." (Emphasis added.)

Thus it is clear to this Court that as of October 11, 1963, no suggestion had been made to the Secretary that he had any legal right to attempt the unprecedented move that he made several days later when he in effect fired the plaintiff.

What caused the change in the position taken by the Secretary?

There were two memos from Barry to the Secretary included in that November 1 letter. One discussed the various charges against Littell. The other memo, marked "confidential," recommended termination of plaintiff's contract. This Court has found (finding No. 36) that Barry prepared these two memos at defendant's direction after plaintiff had refused to resign. This Court has further found that the decision to circumvent the Tribal Council, the only authorized entity legally capable of terminating the contract, was motivated by the realization that more than half of the 74 regularly elected members of that body wanted to keep Littell. Thus it appears that the change in attitude by Barry and the Secretary was not motivated by a recognition of any existing legal power to cancel the contract, but by their creation of an assumed power not authorized by law but only motivated by their desire to "get rid of Littell."

The right course of conduct—the fair and just course of conduct—that should have been followed by the Secretary under the circumstances would have been to use his prestige and influence to get this controversy placed before the Tribal Council as soon as possible after the receipt of the Advisory Committee's charges against plaintiff in June of 1963. It appears to the Court that the Tribal Council would have been the proper tribunal to assure an adequate investigation of the facts relating to plaintiff's alleged misconduct.

Since the Court of Appeals offered no guidelines for this Court's consideration of the "possible applicability of 25 U.S.C. § 82 (1958)," 338 F.2d at 542, the Court will now consider this statute. 25 U.S.C. § 82 reads as follows:

"§ 82. *Payments under contracts; aiding in making prohibited contracts*

"No money shall be paid to any agent or attorney by an officer of the United States under any such contract or agreement, other than the fees due him for services rendered thereunder; but the moneys due the tribe, Indian, or Indians, as the case may be, shall be paid by the United States, through its own officers or agents, to the party or parties entitled thereto; and no money or thing shall be paid to any person for services under such contract or agreement, until such person shall have first filed with the Commissioner of Indian Affairs a sworn statement, showing each particular act of service under the contract, giving date and fact in detail, and the Secretary of the Interior and Commissioner of Indian Affairs shall determine therefrom whether, in their judgment, such contract or agreement has been complied with or fulfilled; if so, the same may be paid, and, if not, it shall be paid in proportion to the services rendered under the contract. R.S. § 2104."

It would be wholly unrealistic for this Court to accept the Secretary's interpretation of this statute so as to permit him to do indirectly what he cannot do directly, i. e., effectively frustrate the plaintiff in the performance of his contract by withholding approvals of his voucher payments. In other words, the Secretary by withholding approval of vouchers, can accomplish his desire to "get rid of Littell." Such practice will not be condoned by this Court.

The refusal of the Interior Department to approve pay increases recommended by the Tribal Council, and Nakai himself, for assistant attorneys who have since resigned for economic reasons, has resulted in the virtual destruction of its legal staff.

It is the conclusion of this Court that 25 U.S.C. § 82 cannot be used by the Secretary as a legal basis, under the facts of this case, for interfering with the performance of plaintiff's contract. Such arbitrary abuse of administrative power, as has been exhibited here in the handling of vouchers, must be prevented.

There has been no showing by the Secretary that he can withdraw prior approval of this contract. Once the 1957 contract, with its termination clause, was approved by the Interior Department, the Secretary lost his administrative power to terminate this contract.

## II.

### DID THE PLAINTIFF EXHAUST HIS ADMINISTRATIVE REMEDIES?

■ Since this Court has determined that the entire administrative attempt to remove plaintiff was invalid, it seems pointless to re-explore this issue.

It is clear that the Court of Appeals considered this question in its review of Judge McGarraghy's preliminary injunction, because Judge McGarraghy had made a conclusion of law (no. 4) that "[t]here was no administrative remedy available to the plaintiff." Obviously, if the Court of Appeals had determined that there *was* an administrative remedy available, it would not have allowed the preliminary injunction to stand and would have directed the plaintiff to first exhaust his administrative remedy.

Under the facts and circumstances of this case, where else could the plaintiff have gone for relief other than to this Court?

The Solicitor, who had already found that "Mr. Littell's conduct must be characterized as contrary to and inconsistent with his responsibilities as the Tribe's attorney," was designated by the Secretary to act as the judge or tribunal in determining the plaintiff's status. Faced with this prejudgment by Barry, plaintiff had no alternative other than to seek relief from this Court.

## III.

### DOES THE PLAINTIFF SEEK EQUITABLE RELIEF WITH UNCLEAN HANDS?

■ The Secretary contends that plaintiff has not come into Court with clean hands and, therefore, should be denied the relief he has requested.

The matter of plaintiff's alleged misconduct was not the subject of a full inquiry before Judge McGarraghy, since the issue of unclean hands did not come to the surface until some time after the entry of the preliminary injunction. The Secretary had not filed his answer at the time the preliminary injunction was issued and did not raise the issue of unclean hands until he filed his answer subsequent to the affirmance of the preliminary injunction by the Court of Appeals. This Court decided that it was necessary to resolve this issue at the time of the hearing of the request for a permanent injunction, and adequate opportunity was afforded both sides to present their evidence on the charges of alleged misconduct.

■ It should be stated at the outset that the Secretary's argument that attorney-client contracts are presumptively invalid, Ridge v. Healy, 251 F. 798 (8th Cir. 1918), must be considered in the light of the statutory procedure in 25 U.S.C. §§ 81 and 82 for investigation and approval of Indian contracts by the Secretary. Even if the ordinary attorney-client contract is to be presumed invalid, it does not follow that the same presumption arises in an appraisal of an Indian attorney contract that has passed the scrutiny of the Secretary and been approved by him. It would be unfair to a tribal attorney if the Secretary were permitted to raise the presumption of invalidity once he had found the contract to be valid and had approved it.

■ The Secretary has also contended that the plaintiff is in effect seeking specific performance of his contract. The Court cannot accept this view, since it can hardly be said that specific perform-

ance will result where one party to the contract is not a party to this action. This lawsuit cannot result in the Tribal Council losing its power of termination under the contract.

In any event, this Court has concluded, after a full hearing, that the evidence simply does not constitute a showing of unclean hands on the part of Mr. Littell in his dealings either with the Tribe or with the Interior Department.

Before considering the specific charges of plaintiff's alleged misconduct made by the Secretary, it should be noted that at the trial, the Secretary denounced plaintiff for his "gross misconduct," his "deception," and his "tricky language." Plaintiff himself and his conduct were described as "sneaking," "unconscionable," "unethical," and ultimately "dishonest." If any of these appellations had been substantiated by proof, the Secretary would have had good reason to believe that such an undesirable person as this could do nothing but contaminate the legal affairs of the Tribe by even the slightest involvement with them.

If the Secretary really believes these charges in 1965, it is reasonable to conclude that he probably believed them on October 11, 1963, when he held a face-to-face meeting with plaintiff. Yet it is clear that at that meeting, the Secretary urged Littell to resign as General Counsel, but surprisingly, to continue to act as Claims Attorney.

The Court has as yet received no satisfactory explanation for this inconsistent position taken by the Secretary. It has been suggested that a compromise would result in Littell's confinement to claims work, in which his interest and the Tribe's interest would be more in harmony. It has also been suggested that the Secretary was primarily interested not in the welfare of the Tribe, but wanted someone more acceptable to him to become General Counsel. A consideration of all the evidence makes it difficult for this Court to conclude that the Secretary really believes Littell to be as reprehensible as he would have the Court believe.

Disregarding, for the moment, the motives of the Secretary for pressing such charges, we look at the charges themselves as framed by the Secretary in his brief (p. 12):

"(1) receiving an increase in compensation from $25,000 to $35,000 per annum in 1961, in violation of the express provision in paragraph 4(a) of his contract that there shall be no change in the attorney's compensation for the first five years, and without disclosure to the Tribe;

"(2) obtaining the approval of Amendment No. 11 to the contract, which expressly classified the case of Healing v. Jones as a claims case, without disclosing to the Tribal Council or to the Secretary that the resolution which authorized Amendment No. 11 did not authorize a change in the classification of that litigation, and that cases such as Healing v. Jones are not properly 'claims' cases in any event, and that plaintiff is guilty of a breach of trust and overreaching by placing himself in a position to claim a contingent fee of as much as 10% of the value or of the property supposedly recovered in Healing v. Jones, and

"(3) frequently directing associate attorneys employed for General Counsel services only, to work on claims cases for plaintiff's benefit and at the expense of the Tribe and without making disclosure of that fact to either the Tribe or the Department of the Interior."

It should be remembered that all of these allegations of misconduct are connected with activities originally approved by the Secretary or his predecessor when they were before them for their scrutiny. He is now attempting to have this Court deny plaintiff equitable relief by contending that the "unconscionable" acts which he approved but shouldn't have, constitute "unclean hands."

From all of the evidence, the Court cannot find any act of intentional misconduct or inexcusable negligence which would close the door of equity on Mr. Littell.

Considering the charge that Littell gave himself a $10,000 raise in 1961 in the face of a 1957 contract provision that declared a five-year moratorium on raises, it must be noted that: (1) the Tribal Council approved the raise, and (2) the Secretary approved the raise. It is clear that the Tribal Council wanted to give plaintiff a raise and there is nothing in contract law that prohibits two parties from impliedly amending a contract by mutual consent.

As for Healing v. Jones, it really is of no concern to the Court whether it is a claims case or not. What does matter is whether the Tribal Council wants to pay plaintiff a contingency fee for his work on this case. Apparently, the Council has this in mind. It should have it in mind, because Mr. Littell has on several appearances before the Council called Healing v. Jones a claims case and clearly stated that claims cases involve a contingency fee. In Udall v. Littell, supra, 338 F.2d page 541, the Court stated:

"The solicitor's memorandum discussed, *inter alia*, a case entitled Healing v. Jones. Whether that action should have been classified as a 'claims' case or considered part of the general counsel's normal service seems to have been in question."

For example, the evidence showed that former Solicitor Stevens at first held that this case was not a claims case, and later reversed himself and said it was a claims case. Furthermore, John S. Boyden, attorney for the Hopi Tribe in Healing v. Jones, advised the Hopi Tribal Council that it was a claims case.

In footnotes 11 through 13 in the Court of Appeals opinion, 338 F.2d at 541, there appears the following brief summary of Healing v. Jones:

"Congress in the Act of July 22, 1958, a special jurisdictional statute, had authorized this action, 72 Stat. 403, while Jones was chairman of the Tribal Council.

"In 1958, Senators Hayden and Goldwater had co-sponsored S. 692 to declare certain lands to be held by the United States in trust for the Hopi Indians and such other Indians as 'heretofore have been settled thereon by the Secretary of the Interior.' (See Exec. Order, December 6, 1882). The Navajo and the Hopi Tribes were authorized to commence or defend an action against each other for the purpose of determining their respective rights and interests in those lands. See H.R. Rep.No.1942, 85th Cong., 2d Sess.; 104 Cong.Rec. 13196, July 9, 1958. Healing v. Jones * * * followed.

"The Department of Justice challenged the jurisdiction of the court to hear the case and otherwise sought to protect the Government against the 'claims' of the contending parties. Jones for the Navajo Tribe successfully opposed the position of the Government. Healing v. Jones, 174 F.Supp. 211 (D.Ariz. 1959). After extensive pretrial proceedings, the case was disposed of by a special three-judge court. The exhaustive opinion of Circuit Judge Hamley occupies some sixty-seven pages of the printed reports as he traced the history of the problems presented and explored the contentions of the respective tribes with regard to the '1882 Reservation.' The interest of Congressman, later Secretary, Udall was noted by Judge Hamley, 210 F.Supp. at 189.

"It is reasonable to deduce that preparation and presentation of the case by respective counsel must have entailed great skill and professional attainments of a high order. Substantial advantages were gained by the Navajo Tribe. Healing v. Jones, 210 F.Supp. 125 (D.Ariz.1962). The Supreme Court affirmed, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The appellee was of counsel at all times, according to the official reports.

"By amendment No. 11 to the Navajo Tribal Attorney Contract, the cases of Healing v. Jones and Navajo Tribe v. State of Utah had

been added to the 'Claims' specified in § 4(b) of the 1957 contract. The amendment was approved for Secretary Udall as of July 26, 1962 by Assistant Secretary Carver."

Since Mr. Littell has not collected a penny of compensation as yet from claims cases, the matter is still left for future resolution by the parties to the contract.

It appears to this Court that a determination of the status of Healing v. Jones, that is, whether it is or is not a claims case, is not essential to a decision in this action. The ultimate resolution of the matter might better be left to the two parties to the contract, namely, Mr. Littell and the Tribal Council.

All that need be determined at this stage is whether Mr. Littell breached his duty to the Tribe by his handling of Amendment 11. The Court finds he did not.

Finally, the use of General Counsel attorneys on claims cases has been admitted by Littell, but the Court finds no breach of ethics in this diversion of legal assistance. In fact, circumstances made such diversion unavoidable. There has been no harm done to the Tribe. No claims compensation has yet been paid to plaintiff. The Tribe can take advantage of the setoff procedure suggested by Solicitor Barry in his October 1963 memorandum.

A consideration of all the evidence in this case makes it clear to this Court that the Secretary's charges of alleged misconduct by plaintiff have not been proved.

## IV.

### CONCLUSION

The record in this case, which includes (a) the record made on the motion for preliminary injunction that was before the Court of Appeals in Udall v. Littell, supra; (b) the record made on the motion to cite the Secretary and his subordinates for contempt; (c) the record made on the defendant Secretary's motion to clarify the preliminary injunction;

and (d) the testimony and the exhibits adduced in the course of a trial that lasted for two full weeks, does not contain a single complaint at any time by the defendant Secretary, by Solicitor Barry, by Chairman Nakai, by the Denetsones, by Barry DeRose, or any one else, of any lack of professional competence on plaintiff's part in any matter in the course of his representation of the Navajo Tribe of Indians over the seventeen and a half years during which he has acted as their General Counsel and Claims Attorney. And during this period the plaintiff has at all times represented his client competently, faithfully, loyally and honestly.

After giving consideration to all of the evidence that was introduced during the contempt proceeding and the present action, the Court is of the opinion that the plaintiff, after more than seventeen years of hard work and faithful service in behalf of the Navajos, and after having contributed so much to helping the Tribe advance from a position of poverty to that of great wealth, was entitled to better treatment and consideration by those in a position of authority than he received.

And the Court can only characterize that treatment, under the facts and circumstances of this case, as brutal and shabby.

The Court cannot refrain from expressing the hope that all concerned will do their utmost to present this matter to the Navajo Tribal Council for *its* decision as to whether or not *it* wishes to terminate the plaintiff's contract.

It has been the policy of the Federal Government to foster and encourage self-government for the Indians. The ability of the Tribal Council to resolve this dispute has been questioned by the Secretary and others. Mrs. Annie Wauneka, a distinguished Indian leader whose dedication to the welfare of the Tribe has been recognized by the President of the United States by his awarding to her the Medal of Freedom, is a member of the Tribal Council. The wisdom, honesty, sincerity and judgment manifested by her while

she was testifying in the contempt proceeding and also in this action and also that of Mr. McCabe, the Director of Administration for the Tribe, has greatly impressed the Court. The Court chooses to give more weight to their testimony than it does to that of the Secretary, Barry, DeRose, and the Denetsones, and particularly with reference to their testimony regarding the ability of the Tribal Council to conduct its own affairs and make its own decisions.

Mr. McCabe, who has attended practically every Tribal Council meeting since July, 1951, expressed confidence in the ability of the Council members to handle their own affairs. He testified that a few of the matters the Council has considered and resolved included the development of mining regulations, grazing regulations, and trading post regulations, and the preparation of an annual Tribal budget.

Mrs. Wauneka has been a Council member since 1951 and the Court has already commented upon her credibility as a witness. She testified that the Council members are "able and capable of handling the Tribal affairs to my way of thinking." (Tr. 1600.)

The Court finds from the evidence that the Tribal Council has the ability, knowledge, and intelligence to handle its own affairs.

It is the Court's opinion that this whole controversy could have been averted by the Secretary if he had directed Nakai and the others with whom he conferred about this dispute in his office in June 1963 to present it to the Tribal Council for their resolution rather than by handling it in the manner that he did.

Indian self-government should be a meaningful goal rather than an empty phrase. Up to now, those who have suffered most as a result of this feud have been the Navajos. It is hoped that in the future they will be given the right and the opportunity to decide their own problems.

A permanent injunction will issue forthwith.

## APPENDIX I

## ON MOTION FOR CIVIL CONTEMPT ORDER

The Court delivered the following opinion orally in denying plaintiff's motion for an order adjudicating defendant and others in contempt for violation of the preliminary injunction entered in this Court November 29, 1963.

In this case, a preliminary injunction was issued by Judge McGarraghy on November 29, 1963, which enjoined the defendant, Mr. Udall, his officers, agents, subordinates and employees, and any and all persons acting by virtue of or under his authority or direction, and all persons acting in participation and concert with them, who have actual notice thereof, from terminating or cancelling plaintiff's contract of employment as General Counsel of the Navajo Tribe of Indians, and from suspending or otherwise improperly interfering with plaintiff's performance under said contract. This injunction is still in full force and effect.

The defendant, Mr. Udall, was served with a copy of this injunction on December 2, 1963, and Mr. Zimmerman had personal knowledge both of the existence and the terms of the injunction, he having been present in Court during the argument on plaintiff's motion for a preliminary injunction, and having also been present in the chambers of Judge McGarraghy while the objections to form thereof were made and ruled upon. This appears from the affidavit of Mr. Frederick B. Wiener, counsel for the plaintiff, dated December 16, 1963.

The plaintiff stated in his motion for an order adjudicating Mr. Udall and Mr. Zimmerman in contempt that the defendant, Mr. Udall, and his officers, agents, and employees, including the said Mr. Zimmerman, violated the terms of the injunction in that they confederated and conspired with divers other persons to prevent plaintiff from acting in fact as General Counsel of the Navajo Tribe of Indians. Paragraph 5 of this motion sets forth several things that were allegedly done by the defendants, particularly Mr.

Zimmerman. It is alleged also that after the plaintiff was ejected by the Sergeant-at-Arms that Mr. Zimmerman said to one Council Member, Mrs. Annie E. Wauneka, (who was a recent recipient of the Medal of Freedom from President Johnson): "After all, you have seen that you can't push the Secretary of the Interior around." It is alleged that this meant that the actions taken as aforesaid had been taken at the instance of the defendant, meaning, of course, Mr. Udall. That, of course is an allegation made by the plaintiff.

Now, the plaintiff in his affidavit in support of the motion, alleges in substance that the Navajo Tribal Council was convened for a special meeting at Window Rock, Arizona, on Monday, December 9, 1963; that he arrived there on the morning of December 9th for the purpose of carrying out the business of the General Counsel pursuant to the contract of August 8, 1957, which provided in part as follows:

"The General Counsel shall report to the Tribal Council at any regular or special meeting on matters pertaining to legal affairs of the Tribe when in his opinion or that of the Chairman, the Advisory Committee, or the Tribal Council, the busines interests of the Tribe so require."

The plaintiff further stated that in his opinion the best interests of the tribe required that he report to the Tribal Council as to various legal affairs of the tribe, especially and among others, the issues pending before this Court and the provisions of the temporary injunction issued by Judge McGarraghy. He further stated that attendance by the General Counsel at regular or special meetings of the Navajo Tribal Council for a portion of the session of each such meeting is an established practice which has been regularly followed for over sixteen years.

He further stated that his presence at Window Rock was also required by the necessity of reviewing and coordinating the legal work of the staff retained by the Navajo Tribe.

The plaintiff further alleged that on the first and second day the Council was in session, the following principal representatives of the Secretary of the Interior, the Solicitor of the Department of the Interior, and Commissioner of Indian Affairs attended the Council meetings sitting at or near a desk located at the right of the rostrum, where the Chairman of the Navajo Tribal Council, Raymond Nakai, sat:

Stanley Zimmerman, Special Assistant to the Solicitor of the Department of the Interior;

Fred B. Haverland, Area Director, of Gallup, New Mexico;

Glenn R. Landbloom, Superintendent of the Navajo Agency;

Chester Wilson, Assistant to the Superintendent;

and others whose names were unknown to the plaintiff.

It was also alleged that there was in attendance sitting beside the above-named Stanley Zimmerman, one Harold Mott, an attorney from Washington, D. C.

As has been stated by the Court, an injunction was issued by Judge McGarraghy and it prevented the named parties from doing three things, and the Court will read those specific provisions:

First, from terminating or cancelling the contract of plaintiff's employment as General Counsel and Claims Attorney of the Navajo Tribe of Indians, which said contract was approved on November 15, 1957, as of August 5, 1957, as further amended and approved;

Second, suspending or otherwise improperly interfering with the performance by the plaintiff under and pursuant to said approved contract with all approved amendments thereto; and

Third, stopping or preventing the ordinary course of payment to him according to Revised Statutes, Section 2104, (25 U.S.Code, Section 82) of the agreed retainer fee due under said approved contract with all approved amendments thereto, including sums now due him for services performed thereunder during the months of September and October 1963.

Both sides agree that if the injunction was violated it was violated with respect to Paragraph 2. So the Court will confine its remarks to that particular paragraph.

The Court will now have a few words to say regarding the various parties to this litigation. First of all, the plaintiff is a lawyer with a great many years of practical experience. At one time he served as Assistant Attorney General of the United States in charge of the Lands Division, a very important position. He also served in numerous other important positions throughout his legal career.

The evidence further showed in this case that he became General Counsel for the Navajo Tribe sometime in 1947, and he had a written contract to act in that capacity for a period of ten years. That contract was renewed for another period of ten years, convincing the Court, at least, that he was held in high esteem and high regard by the members of the tribe as a whole.

The contract that I referred to has a few more years to run. It will expire in 1967.

Mr. Littell started to serve in 1947 as General Counsel with an annual salary of $5,000, which has been increased from time to time until at the present time he is receiving $35,000 per year. He also acted as Claims Attorney and has appeared in many important cases in behalf of the tribe, both in Washington and elsewhere.

I think the record in this case clearly shows that he would not have been held in very high regard as General Counsel by the people of the tribe for many years, if he were not a man of outstanding integrity and character, and in this connection I refer to the testimony of Mrs. Wauneka and Mr. McCabe, who went into that in some detail.

So I think we have a little of the background of Mr. Littell, and Mr. Pittle indicated in his argument a while ago that Mr. Littell deserves a great deal of credit for bringing this tribe from a position of poverty to a position of prosperity.

We are not dealing with the ordinary type of person in this case. We are dealing with an outstanding lawyer.

Now, we go from that party, the plaintiff, and the Court will now discuss briefly the contract under which Mr. Littell performed his services and which has been mentioned several times during the hearing. Paragraph 3 of this contract states as follows:

"*Direction by Chairman, Advisory Committee and Council:* The said attorneys shall perform the duties required of them under this contract upon the request and at the direction of the Chairman of the Navajo Tribal Council subject to such instructions as he may receive from time to time from the Advisory Committee or the Tribal Council."

The Court believes that the second sentence must be considered in connection with the first sentence, however, in construing this paragraph. The second sentence reads:

"The General Counsel shall report to the Tribal Council at any regular or special meeting on any matters pertaining to the legal affairs of the tribe when in his opinion, or that of the Chairman, the Advisory Committee or the Tribal Council, the best interest of the tribe so require."

The words there are in the disjunctive, and not in the conjunctive so the Court feels that that paragraph, considered as a whole, means and meant that Mr. Littell had not only the legal right but the duty to appear at that meeting of December 9th when in *his* opinion matters of interest to the tribe should have been discussed.

So, the Court will rule as a matter of law, first, that Mr. Littell had the *legal right,* and I might go further and say again, that it was *his duty* as General Counsel to be present on December 9th.

Now, the Court will discuss some of the other parties to this litigation. It is clear from the record that Mr. Udall had knowledge of the terms of the injunction, as he stated from the stand, and he dis-

cussed those terms with Solicitor Barry. But there is no direct evidence in this case that Mr. Udall had any conversation with Mr. Zimmerman prior to Mr. Zimmerman leaving for Window Rock to attend the meeting of December 9th. There is no evidence that he gave Mr. Zimmerman any instruction or told him what to do there, other than what might be assumed or might be inferred, and I think it is a reasonable inference to draw, that he probably had knowledge that Mr. Zimmerman was going there to explain the terms of the injunction, and probably attend that meeting.

We will move on now to some of the other people present during that meeting. I have already named some of them. Besides those I have already named was Mr. Nakai.

Now, this is a case in which you have to put pieces of evidence together. In other words, as Mr. Wiener said, you put the jig saw puzzle together and then draw the inferences that you think should be drawn from the evidence. First of all, the Court is reminded of a rule of law, which is particularly applicable, I think, to this type of case, because this is a conspiracy charge, which is a charge easily made, hard to prove, and still harder to defend against. In other words, a charge of conspiracy is one that is easily made by someone, and it is difficult to prove that charge, because one has to rely most of the time on circumstantial evidence as distinguished from direct evidence, and it is also a charge that is difficult to defend against. By that I mean, a person may not be present when a conversation is had, and someone may say John Jones said this, when John Jones may not have said anything of the sort. He was not present to deny that statement.

Also, I think a principle of law that is involved in this case (since I am sitting here in a dual capacity, as I have indicated before, as Judge and jury, and we often instruct the jury this way in a criminal case), is that if the jury can reconcile the evidence with any reasonable hypothesis or theory consistent with the innocence of the defendant, it is their duty to do so.

I appreciate this is not a criminal case, and the charge here is civil contempt, but no matter if that be the fact, that principle of law, I believe, still applies to the facts in this case.

Now, we get down to the meeting of December 9th, and this is what the Court thinks happened. This has been a very hot political fight, I mean in the sense of politics within the tribe. Mrs. Wauneka has served faithfully and well over a period of many years. She happens to be, I believe, a member of the Old Guard, as Mr. McCabe is, and a new Chairman has been elected and now holds the office.

Now the question is: What transpired at that meeting, and were the parties at that meeting a part of this so-called conspiracy that Mr. Wiener has talked about?

Was there a conspiracy? Was there concerted action? Was there a desire to oust Mr. Littell? At least as to some of these people, I would not go so far as to say the evidence shows there was a conspiracy plot, but we will take Mr. Zimmerman, to whom I have alluded.

Here is a young man, probably ambitious, intelligent, who had just arrived at the Department of Interior, holding a responsible position, knowing all about the background of this case, knowing that there had been a change in administration, having been sent down there as a representative of the Interior Department, meeting Mr. Mott, an attorney from Washington, who was retained to represent Mr. Nakai; and, of course, they all knew down there, every one of them, and there is no doubt in this Court's mind, that one of the things that they would have liked to accomplish was the removal of Mr. Littell as General Counsel, a man who had done so much for the welfare of these people in all these sixteen and a half years, who had brought them along the highway, who had helped them to prosper. Why they wanted him out so badly I have been unable to tell yet, because there have been a lot of

suspicious circumstances and allegations, but I must decide this case on the evidence.

Now, there has been a lot of talk about people at the Indian Bureau, that they didn't have any right to say anything, and maybe that is so; maybe they didn't have a legal right to say anything, or maybe it wasn't good policy for those people from the Indian Bureau to mix into the internal affairs of the tribe, and maybe it would be better to allow them to be self governed as it has been stated here on the stand. But they were sitting there, knowing about this controversy, knowing about the terms undoubtedly of the injunction, knowing of this fight that has been going on between Mr. Nakai and Mr. Littell; and incidentally, the only conclusion the Court can come to from the failure of Mr. Nakai to come here is that had he appeared his testimony might have been unfavorable. I don't accept the explanation given by his attorney that he would come here under his conditions, that he would take the stand and permit the Court to question him, but not to be cross-examined by counsel, Mr. Wiener. Of course, this Court does not permit anything like that to happen here. So, his failure to appear in this Court, at least indicated to the Court that maybe he did some of the things that it is alleged that he did down there. Maybe he did these improper things. I don't know; maybe he did. But I cannot speculate on this subject. I know he was anxious to get Mr. Littell out. He was anxious to get his own General Counsel in there, whomever that might be.

When you put this whole thing together, what do you have? You have a young lawyer, Mr. Zimmerman, zealous, undoubtedly eager to make good, wanting to make a good showing. He could have gone there and minded his own business and said to the members of the Indian Bureau: Here is the injunction, here is the way we interpret it, you can do this, or you cannot do that. I see nothing wrong with Mr. Zimmerman having been sent there by the authorities, provided he didn't do what he did there.

Now, what he did could be attributed to bad judgment, carelessness, negligence, or evil intent, or you could draw many inferences from what he did. As I indicated before, I listened to this lady, Mrs. Wauneka, who was so proud, and who indicated at least she was so happy, to receive that wonderful award, the Freedom Award, from the President of the United States, and why shouldn't she be proud? I think she is a woman of character. I think she is a truthful individual, and this argument made by the Government that her expenses were paid does not hold a grain of salt with this Court because how else would she get here? You certainly would not expect her to pay her own fare. There is nothing improper with counsel paying her expenses. But she did come, which is more than Mr. Nakai did.

She testified as to what Mr. Zimmerman told her. Now, Mr. Zimmerman should have minded his business and should have done what we might call an objective job and should have sat down with the people of the Indian Bureau and said: Now, listen, gentlemen, this matter is pending in Court; Judge McGarraghy issued this injunction, and we don't want any trouble here; and let us wait until the Court acts on this; and let this man appear here as General Counsel.

And to me, Paragraph 3 of that contract is plain and unambiguous, and I don't see how any lawyer could interpret that contract any other way, because all you have to do is read the two sentences and you will find, I think, that the second sentence says in effect that Mr. Littell had the authority and the legal right to appear at that meeting.

Mr. Zimmerman has been a teacher; he is a young man of some prominence, very eager to be promoted, I suppose; but I think he over extended himself. I think he pushed himself too much. I think he was too eager to help the Indian Bureau, who sat idly by, and by their actions, and I agree with Mr. Wiener, gave tacit approval to what Mr. Nakai was doing, sitting on the rostrum or the

bench. Of course, he received encouragement from the Indian Bureau. Of course, it was common knowledge that this never happened in the sixteen and a half years prior to that time, and, of course, it was an unusual situation. But the Indian Bureau men who offered advice from time to time in the past, and who had a right to step in, at least a moral right to step in, should have stepped in when they saw this terrific fight developing on the open floor, when one faction was in favor of Mr. Littell and the other faction against him.

Now, why didn't Mr. Zimmerman say: Now, wait a minute, Nakai, you can't do that; you can't do that; this is still a free country; I suggest that you not eject this man.

So they were not surprised. They were not surprised when that act took place. Neither was Mr. Mott surprised. Mr. Mott is an attorney with many years' experience. He has been around Washington a long time. He knew what might have happened. All of these whispered conversations back and forth, going to lunch together—of course, it is reasonable to infer as Mr. Wiener said—what was the purpose?

Having that in mind, I am convinced beyond any doubt that all of those people there knew that the primary purpose of being there was to get Mr. Littell out. They didn't object when he was ejected by the policeman. They weren't surprised about what happened.

Now, the question is: Did Mr. Zimmerman improperly interfere with the functions of the attorney under his contract? I am speaking quite frankly now, I know this is a very important case to all the people involved, including the lawyers on both sides. I do not feel that there has been clear and convincing evidence insofar as the Secretary of the Interior is concerned, or insofar as Mr. Barry is concerned, because I cannot speculate, conjecture or guess them into a citation for contempt. I must, in effect, be convinced beyond a reasonable doubt, or to put it another way, if this were a criminal conspiracy case being tried be-

fore a jury, and I were called upon as the Judge to decide after the Government had introduced all of its evidence, whether or not there was substantial evidence to take the case to the jury (and I think this is one of the tests I must apply), would I permit this case to go to the jury in the posture of this case? I must be frank to say that if this were a criminal case, I would have to direct a verdict in favor of the defendant, those two defendants particularly, in a conspiracy case involving the violation of a criminal statute, which this is not.

Now, of course, I can speculate and I can guess that the Secretary did this or Mr. Barry did that, but there is not substantial evidence that convinces me that they told Mr. Zimmerman: You go down there, Mr. Zimmerman, and you be the hatchet man, and you be the front man and you whisper to Mrs. Wauneka, and you try to get her side to throw Mr. Littell out.

Of course, Mr. Zimmerman didn't have any right to do what he did, and I think he knows it better than anybody. He didn't have any right to tell Mrs. Wauneka what he did: "You ought to know you can't push the Secretary of the Interior around." And then she drew her own inference from that, and the Court might draw another inference from that remark.

So, you have all these facts now. What does it come down to? As I said, I don't condone what Mr. Zimmerman did; I don't condone what the Bureau representatives did; or what Mr. Mott did. As you said, Mr. Wiener, I don't know how much Indian law Mr. Mott knew. As far as I know, his firm specializes in radio law. I think that is what they used to specialize in, anyway.

As far as Mr. Nakai is concerned, first Mr. Mott said something about who is going to pay his fare. So what happened? With all the hundreds of capable lawyers that you must have in Arizona, he (Mr. Nakai) had to come all the way to Washington to get a lawyer, and he doesn't have enough money to get on a

plane and come here to testify. That is what I think of Mr. Nakai.

I am not accusing Mr. Mott of doing anything wrong. I think he used bad judgment. I think he gave bad advice under the circumstances. I think if Mr. Mott and Mr. Zimmerman had gotten together with the Indian Bureau people and did what I think would have been the right thing to do, and the moral thing to do, they could have stopped this whole controversy in two minutes. They could have said: Mr. Nakai, you don't have any right to do what you are doing, and you know you don't; let's do this in a lawful, democratic way. But they didn't do it that way. They wanted to do it their way.

I would not hesitate one second to find the Secretary of the Interior guilty of this contempt, or Mr. Barry, or Mr. Zimmerman, if I thought the evidence warranted it. But as I say, I might guess that they are guilty, I might speculate that they are guilty, but applying the test I have indicated and the law which I think is applicable to this case, I cannot conscientiously say that they at least were parties to any conspiracy. You may be right, Mr. Wiener, in your conclusions, I do not say you are not, but I must decide this case on the evidence that has been introduced in open Court here. I cannot decide it on whether or not there is a political battle going on there between the Republicans and the Democrats, or whether Mr. Littell has now a gold mine and somebody else would like to get on the gravy train, because you can read those things between the lines if you want to. After all these years, after a man has worked hard and helped build up this tribe, and along comes some of these so-called political lawyers, if that is the case, and I have no definite proof as to that, but if it is the case, they want to step in and get the gravy. But I can't decide that, for a fact. That might be the inference to be drawn, but the evidence just is not here.

It now comes down to this: What to do with Mr. Zimmerman. I have already indicated how I feel about the evidence as to the other two. Should I find Mr. Zimmerman guilty of contempt of Court for improperly interfering with the duties of Mr. Littell? I am going to conclude as follows as to him: First of all, I don't think he had a right to do what he did. I think he was wrong. I think he didn't use good common sense when he came to interpret Paragraph 3 of the contract, and I don't care how good a lawyer he is. There is a difference between being a lawyer and a practical lawyer, because he will find out after years of experience, when he gets 20 or 30 years older, that all the law is not contained in the law books. He will find that out.

I don't mean to sit here and reprimand this young man, but I think this at least ought to be a good lesson to him, and it ought to be a lesson to the members of the Interior Department, particularly the members of the Indian Bureau in the area where this controversy arose. It ought to be a lesson to the Secretary, and to Mr. Barry, to be more careful of the type of man they send to attend these meetings; but in conclusion, let me say this, gentlemen: The Court has given this case a great deal of consideration. Mr. Littell, I feel, will be permitted or should be permitted to continue his representation of these people at least until the Court can decide this matter. This matter is in the Court of Appeals now.

I have heard it said that the Secretary, or Mr. Barry, take the position that they should not interfere with the internal affairs of the tribe. I sincerely believe that from this moment on, if the Secretary instructs the Indian Bureau people to tell Mr. Nakai to lay off Mr. Littell, he won't have a bit of trouble; and you can always come back into this Court if anything like that happens again, pending the outcome of the appeal and ask for another injunction. Mr. Wiener knows that.

They have all been put on notice as to what transpired there, and there is no occasion for it to happen again. I think that they have learned or they should have learned a good lesson. I am not

criticizing Mr. Udall, and I am not criticizing Mr. Barry, and for that matter, I am not criticizing Mr. Zimmerman, but I am saying what I think the evidence shows in this case.

Now, in conclusion, the Court having spoken as to how the Court feels about this matter, the Court feels that the evidence in this case is just not sufficiently clear and convincing for the Court to find these defendants guilty of civil contempt. There have been mistakes made, bad judgment, and bad advice given, yes, maybe by prearrangement, and I can never forget those words that were uttered by this lady on the stand, Mrs. Wauneka, and I have practiced law in the District for thirty years before assuming my place on the Bench, seven years ago this April 2nd, and in my 37 years of experience, I don't believe I have ever heard or seen a witness on the stand who made a better impression on this Court than that lady, and I can say the same thing for Mr. McCabe.

I hope the remarks that the Court has made will be given some consideration by the authorities, at least, and I hope that this will not happen again, Mr. Littell, and I don't think it will happen again. I think that they realize they were wrong, and that this ought to stop, and give our Court of Appeals an opportunity to decide this case on the merits.

That is all I have to say about the matter. The matter is closed as far as I am concerned.

This opinion will constitute the findings of fact and conclusions of law. Counsel will prepare and submit an appropriate order.

APPENDIX II.

FINDINGS OF FACT AND CON-
CLUSIONS OF LAW

A. THE PARTIES AND THE BAS-
IC CONTROVERSY

1. Plaintiff, a citizen of the United States and a resident of the State of Maryland, is a member of the Bar of the State of Washington and of the District of Columbia in good standing. Defendant is the Secretary of the Interior of the United States, a citizen of the United States, and officially resident in the District of Columbia.

2. The Navajo Tribe has a population of approximately 100,000 members and occupies a reservation in Arizona, New Mexico, Utah and Colorado of approximately 24,000 square miles. It has extensive resources, including approximately $80,000,000 on deposit in the United States Treasury, and has a monthly income from mineral leases of approximately $1,000,000. The Tribe governs itself, without regard to the laws of the states where the reservation is situated. Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251.

3. Since August 1947, plaintiff has been General Counsel and Claims Attorney of the Navajo Tribe of Indians, and he is now serving as such pursuant to a contract executed in 1957 for a ten year term expiring on August 7, 1967. This contract and twelve amendments thereto have all been approved by the Secretary of the Interior or his authorized delegate pursuant to the provisions of R.S. § 2103 (25 U.S.C. § 81). The 1957 contract and the twelve amendments thereto are incorporated herein by reference.

4. By resolutions promulgated by the Navajo Tribal Council and amendments to the 1957 contract, which were approved by the Department of the Interior, plaintiff's compensation as General Counsel was increased on August 14, 1961, to $35,000 per annum.

5. The foregoing contract as amended contains in paragraph 12(a) thereof a provision for termination by the Navajo Tribal Council for good cause shown upon 60 days' notice, with the approval of the Commissioner of Indian Affairs, any dispute as to the sufficiency of the cause to be submitted to the Secretary of the Interior for his determination. The contract does not by its terms confer upon the Secretary of the Interior any right to terminate the contract.

6. The Navajo Tribal Council mentioned in the preceding finding consists of

74 members and is the governing body of the Navajo Tribe under the provisions of Title 2, Section 101, of the Navajo Tribal Code, hereinafter cited as "N.T.C.," all of the relevant provisions of which have been approved by the Secretary of the Interior or his authorized delegate.

7. The Navajo Tribal Council has neither terminated nor suspended its contract with the plaintiff, nor has it authorized or directed or requested the defendant or any other individual or group to do so.

8. The Chairman of the Navajo Tribal Council is elected by the popular vote of the Tribe (2 N.T.C. § 281). He is responsible for directing and supervising the personnel and executive or business staff of the Tribe (2 N.T.C. § 284), but he has no power to select attorneys to represent the Navajo Tribe. The latter power is vested in the Navajo Tribal Council (2 N.T.C. § 1173(c)).

9. Prior to the fall of 1964, the Advisory Committee consisted of nine members selected by the Chairman (2 N.T.C. §§ 341–343). It was accordingly, in the defendant Secretary's words, "a stacked body." It had no power to select attorneys to represent the Navajo Tribe (2 N.T.C. § 344), and no authority in the matter of terminating the plaintiff's contract. Since the fall of 1964, the Advisory Committee consists of 18 members selected by the Navajo Tribal Council.

10. In March 1963, one, Raymond Nakai, received a plurality of the votes in a hotly-contested three-sided election, and on April 13, 1963, was inaugurated as Chairman of the Navajo Tribal Council.

For a considerable time prior to the March 1963 election, Nakai, a member of the Navajo Tribe, who had been employed for 17 years in the Department of the Army and was stationed at Flagstaff, Arizona, and was also a radio announcer, had consistently voiced opposition to the continued employment by the Tribe of the plaintiff as General Counsel.

11. Mr. Nakai campaigned for the office of Chairman of the Tribal Council primarily on a platform "to get rid of Mr. Littell." He advocated less interference in tribal affairs by the plaintiff and legal department of the Navajo Tribal Government, which is under the supervision of the plaintiff as General Counsel, and charged that the plaintiff had misrepresented to the Tribe the result in the Navajo-Hopi boundary dispute involved in Healing v. Jones. Nakai had campaigned for election as Chairman in 1959, but was unsuccessful. During the four years preceding the 1963 election, he continued his campaign by speeches, articles and circulars.

12. On or about April 4, 1963, after Nakai's election but prior to his inauguration, Nakai, Leo Denetsone, who is the husband of Genevieve Denetsone, and a Mr. Bugge made a trip to Washington and conferred with Secretary Udall and members of his staff. Nakai wanted to get rid of plaintiff and wanted Secretary Udall to assist him in getting an attorney. Defendant Secretary suggested that someone in the area of the reservation be obtained. Nakai and his group also conferred with Frank Barry, Solicitor of the Department of the Interior, and asked whether or not attorneys could be paid with tribal funds. Barry's answer to this was negative but he did give his opinion that attorneys could be privately retained. At the time, or shortly thereafter, Nakai consulted with Richard Schifter of the Washington, D. C. Law Firm of Strasser, Spiegelberg, Fried, Frank and Kampelman. It appears that Nakai wanted Schifter to become the new general counsel.

13. Nakai was inaugurated as Chairman on April 13, 1963. He appointed Leo Denetsone as his Administrative Assistant. Leo Denetsone's wife, Genevieve, had already shown to her husband the papers dealing with plaintiff's contract, and thereafter at Nakai's direction both Denetsones collaborated in examining the files pertaining to plaintiff's contract.

14. On April 15, 1963, Nakai, the plaintiff, and Leo Denetsone had dinner together and conferred at length. Denet-

sone suggested the plaintiff resign as General Counsel and keep claims work. Plaintiff answered that he would not consider it. Arrangements were made for visits by Nakai to each office of the legal department. Thereafter at least half a dozen conferences between Nakai and plaintiff were held. The atmosphere was friendly and Nakai suggested that he and plaintiff communicate on a first-name basis. At one of the conferences held on or about May 1, 1963, plaintiff conferred with Nakai concerning the report of the legal division which plaintiff was to make to the Tribal Council and about a proposed amendment raising the salaries of certain subordinate attorneys.

15. For a period of several days beginning on May 7th or 8th, 1963, the plaintiff presented the report of the legal division to the Navajo Tribal Council and during the same period the Council considered the legal department budget. On May 10th the legal department budget was overwhelmingly approved by the Council with the personal endorsement of Chairman Nakai who had assured the Council that there would be cooperation between himself and the General Counsel. The plaintiff then left Window Rock for Washington so that he could appear before the Indian Claims Commission in the week beginning May 13th. At Window Rock on May 13th, the Council unanimously adopted a resolution to amend the attorney contract by raising the salaries of certain associate attorneys of the legal staff. The plaintiff did not return to Window Rock until about June 6th.

16. Both before and after Nakai's inauguration, Schifter and an associate attorney of his firm, Allen Wurtzel, were present in Window Rock conferring with the Chairman, the Vice Chairman and the members of the Advisory Committee selected by Chairman Nakai. Wurtzel, as early as May 1st, was heard to comment that the way to solve the problem was to terminate the General Counsel. Also, in early May 1963, Schifter telephoned Barry DeRose, an attorney of Globe, Arizona, who was counsel for the White Mountain Apaches, and asked DeRose if he would be interested in assisting on the local level in establishing a public housing authority on the Navajo reservation. Later in May, DeRose went to Window Rock and met with individual Navajos. They principally discussed the plaintiff. DeRose remained there one or two weeks leaving on May 31st. The Denetsones turned over to DeRose the contract papers which Mrs. Denetsone had taken from the files. Mr. DeRose advised that in his opinion there was cause for terminating the attorney contract.

17. Also, in May, Nakai made another trip to see Secretary Udall. On this occasion, Nakai told the defendant Secretary that there was a deep and hostile gulf between himself and the plaintiff and pressed for action regarding the plaintiff.

18. On May 31, 1963, during plaintiff's absence, Nakai presented to the Navajo Tribal Council a proposal to create a Navajo Housing Authority to provide low-cost housing on the reservation with the assistance of Federal grants. The resolution had been drafted by Schifter. The discussion by the Council continued into June. Schifter addressed the Council and represented the need for prompt action lest the grants become unavailable.

19. On May 31, 1963, the Advisory Committee of the Navajo Tribal Council authorized a contract between the Navajo Tribe of Indians and the law firm of Strasser, Spiegelberg, Fried, Frank and Kampelman, and Barry DeRose, whereby the latter were to be retained for a period of 90 days as "consultants" at the rate of $1000 each per month.

20. On or about June 6, 1963, the plaintiff returned to Window Rock. He had been furnished with a copy of the housing ordinance by members of the Council. Plaintiff was in favor of the ordinance, but opposed to certain clauses which, in his opinion, would result in a dangerous potential waiver of the sovereign immunity of the Tribe, and so advised the meeting of the Navajo Tribal

Council. Plaintiff then on June 12th returned to Washington and conferred with the Deputy Housing Administrator to see if there was such a need for speed as indicated by Schifter and was informed that there was not. Plaintiff then conferred with Mr. Hayden at the Bureau of Indian Affairs and agreed upon a formula which would avoid the risk of the sovereign immunity problem. On June 14th, plaintiff sent a telegram to Nakai advising him that there was no need of rushing the matter. However, after plaintiff's appearance before the Council hereinabove mentioned, the relationship between plaintiff and Nakai had deteriorated, and the telegram was not presented to the Council. On June 14, 1963, the Housing Ordinance was passed as originally proposed.

21. Meanwhile, DeRose had returned to Window Rock and appeared before the Tribal Council respecting the establishment of the housing authority. He also was conferring with individual members of the Tribe about a series of matters including the Littell contract. On June 14, 1963, while the Housing Authority proposal was being debated in the Tribal Council, DeRose, armed with the contract file which Mrs. Denetsone had given him, sought to persuade Mrs. Annie Dodge Wauneka, a member of the Navajo Tribal Council, that the plaintiff's contract should be terminated because of alleged irregularities on his part. DeRose also stated that he and Nakai and others were going back to Washington as fast as they could to see Secretary Udall about plaintiff's alleged irregularities. In the course of his conversations with Mrs. Wauneka, DeRose suggested that she could obtain employment under the Housing Authority.

22. On June 17, 1963, the contract with the Navajo Tribe authorized by the Advisory Committee Resolution of May 31st, referred to in Finding No. 19, and pertaining to the retention of DeRose and the firm of Strasser, Spiegelberg, Fried, Frank and Kampelman was executed.

22A. At the June 14th meeting with Mrs. Wauneka, Mr. DeRose stated, "We are going to Washington * * * I can contact the Secretary any time just like this (snapping his fingers). I can contact him any minute. This is what we are going to take over there, and Mr. Littell will be terminated."

23. On June 18th, DeRose telephoned defendant Secretary Udall's personal secretary and arranged for a conference with the defendant Secretary in Washington.

24. On June 19th, the conference took place in Washington, D. C. Present were Nakai, DeRose, Schifter, L. Denetsone, and several others. Defendant Secretary asked the group if they had brought the controversy to the Navajo Tribal Council, or proposed to bring it up before that body. DeRose said that Nakai wouldn't have a chance against the plaintiff. Defendant Secretary, who was very familiar with the Navajo Tribal Government and who knew that the Advisory Committee had been appointed by Nakai and was a "stacked body" in Nakai's favor, told the group to go back and prepare a memorandum and get the Advisory Committee to pass a resolution.

25. All proceedings before the Navajo Tribal Council are translated from English into Navajo and from Navajo into English. The plaintiff does not speak Navajo. Nakai had a radio program before his election as Chairman, and has the reputation of being a fluent orator in the Navajo tongue.

26. On the following day Nakai advised the press that he would terminate the plaintiff's contract, and that in the meantime he was obtaining legal advice from Messrs. Schifter and DeRose. Schifter had then been on the scene for some two months and was acting as the final approving authority of anything that happened as far as Chairman Nakai was concerned, and Schifter and DeRose were "digging into the matters."

27. Other members of the Navajo Tribal Council protested to the Secretary concerning the Nakai visit on the grounds of non-consultation with the Tribal Council.

28. Upon their return from Washington, DeRose assisted the Denetsones in reducing their complaints to writing, in the form of a resolution that was adopted by the Advisory Committee on June 25, 1963. This resolution is incorporated by reference in these findings. No minutes were taken of the Advisory Committee meeting at which it was adopted.

29. The Advisory Committee resolution was forwarded to the Department, followed by a telegram from Nakai to the Secretary. This resolution triggered the investigatory phase that followed. Neither Nakai, nor DeRose who drafted it, nor any of the members of the Advisory Committee who adopted it, ever brought its substance to the plaintiff's attention.

30. On June 26 and 27, 1963, the plaintiff conferred with the defendant Secretary at the latter's office. The plaintiff objected to Schifter and DeRose acting as lawyers for the Navajo Tribe. The Secretary urged a meeting of the two factions in the Navajo Tribal Council at which no outsiders should be present, and such a meeting was in fact held at Roswell, New Mexico, on or about July 1, 1963, though with inconclusive results.

31. During the conference on June 26, 1963, the defendant informed plaintiff of receipt of the telegram of June 25, 1963, and the plaintiff knew of the existence of the telegram and had knowledge of its contents.

32. On August 22, 1963, Nakai wrote the defendant Secretary asking for action on the Advisory Committee resolution of June 25, 1963. Early in September, the Solicitor of the Department of the Interior hired one, Stanley Zimmerman, a teaching fellow at New York University Law School with no prior experience in law practice or Indian law, to assist in the investigation of the complaints against the plaintiff, and Zimmerman remained in close touch with the present controversy and litigation until late in 1964 when he left the Department of the Interior.

A number of documents on file in the Department of the Interior were examined and reviewed, including the contract; the resolution of February 22, 1962; Amendment No. 11; a letter dated August 25, 1960, from Paul Jones, then Chairman of the Tribal Council, to the Secretary of the Interior, requesting an opinion as to certain cases, including Healing v. Jones, and a reply of November 15, 1960, by Theodore Stevens, who was then Solicitor of the Department, stating that Healing v. Jones was not a claims case. Other documents examined in this connection were a letter dated January 19, 1961, from Mr. Stevens to Mr. Littell, advising the plaintiff that Stevens had changed his mind and that Healing v. Jones was a claims case.

33. Shortly before October 11, 1963, Solicitor Frank J. Barry, of the Department of the Interior, prepared a memorandum dealing with the charges made by the Advisory Committee in June. This memorandum pointed out that only the Navajo Tribal Council had power to terminate the plaintiff's contract, and concluded that the Secretary was justified in recommending to the Council termination of the Navajo Tribe's contract with the plaintiff. This document (Plaintiff's Exhibit A), hereinafter referred to as the October Memorandum, is incorporated into these findings by reference.

34. On October 11, 1963, the plaintiff conferred with the defendant Secretary at the latter's request. A copy of the October Memorandum was shown the plaintiff; he read it hastily, asked for a copy so that he could study it, and that evening a copy was mailed him.

35. In the course of their conference on October 11, 1963, the Secretary urged a "constructive solution" on the plaintiff, by which he meant that the plaintiff should resign. When the plaintiff then pointed out that this would cause irreparable damage to the Navajo Tribe because of the pendency of vital claims cases, the defendant Secretary said that he never intended that the plaintiff should resign as the Tribe's Claims Attorney but only as General Counsel. At

the time of this conversation, plaintiff as Claims Attorney had in 16 years as such never received a penny of compensation for his labors in that capacity.

36. Plaintiff refused to resign in either capacity. Thereafter, the defendant Secretary directed his Solicitor to prepare new memoranda looking to termination of the plaintiff's contract by the Secretary without action by the Navajo Tribal Council. This direction was impelled by at least two factors: (1) plaintiff's refusal to resign, and (2) the realization that a majority of the Navajo Tribal Council were favorable to the plaintiff and would not vote to terminate his contract.

37. By letter dated October 14, 1963, the plaintiff informed the defendant that he was engaged in preparing findings in another case and could not discuss the details of the matter at that time.

38. Pursuant to the foregoing direction, Solicitor Barry prepared two memoranda dated November 1, 1963, in which he determined that "Mr. Littell's conduct must be characterized as contrary to and inconsistent with his responsibilities as the Tribe's attorney," and recommended that the defendant Secretary terminate the plaintiff's contract. These two memoranda, hereinafter referred to as the "November Memoranda" (Plaintiff's Exhibit A), are incorporated into these findings by reference.

39. By letter dated November 1, 1963, the defendant forwarded to plaintiff copies of a memorandum dated November 1, 1963, from the Solicitor, entitled Navajo Tribal Attorney Contract; a copy of a memorandum dated November 1, 1963, from the Solicitor to the Secretary, entitled Navajo Tribal Attorney Contract—Confidential, and a copy of a letter to the Chairman of the Tribal Council, also dated November 1, 1963.

In his letter to plaintiff, the Secretary informed the plaintiff:

"The enclosures are self-explanatory.

"The conclusions which arise from the findings and conclusions in the memoranda mentioned above leave me no recourse but to take the following action:

"a) Your personal performance under the Attorney Contract of the Navajo Tribe dated October 8, 1957, as amended, is hereby suspended;

"b) Your contract will be terminated as of December 1, 1963, unless, in the interim, you can adduce convincing evidence that the conclusions justifying suspension and termination are unwarranted; and

"c) Approval of said contract and all amendments thereto, insofar as such approval relates to your personal performance and right to compensation, is hereby rescinded and withdrawn. Furthermore, I have directed that no payments be made to you under said contract until further notice.

"I have directed that you shall have a full and fair opportunity to present to the Solicitor any evidence which you have by way of explanation or exculpation. I would suggest that you promptly submit such evidence directly to the Solicitor."

40. The plaintiff made no reply, but instead instituted the present action on November 15, 1963.

41. On November 29, 1963, after making findings of fact and conclusions of law, Judge McGarraghy enjoined the defendant Secretary and his subordinates, etc., during the pendency of the present action, from

"1. Terminating or cancelling the contract of plaintiff's employment as General Counsel and Claims Attorney of the Navajo Tribe of Indians, which said contract was approved on November 15, 1957, as of August 5, 1957, as further amended and approved;

"2. Suspending or otherwise improperly interfering with the performance by the plaintiff under and pursuant to said approved contract

with all approved amendments thereto; and

"3. Stopping or preventing the ordinary course of payment to him pursuant to R.S. § 2104 (25 U.S.C. § 82) of the agreed retainer fee due under said approved contract with all approved amendments thereto, including sums now due him for services performed thereunder during the months of September and October 1963."

42. The issuance of the foregoing preliminary injunction was affirmed by the Court of Appeals on August 13, 1964 (Udall v. Littell, 338 F.2d 537), and a petition for rehearing and for clarification was denied on October 16, 1964. The defendant Secretary did not seek certiorari to review the foregoing ruling.

## B. PLAINTIFF'S ASSERTED AD-MINISTRATIVE REMEDIES

43. The defendant Secretary has produced no regulations promulgated by him or by his predecessors governing the termination or attempted termination by him of attorney contracts with Indian tribes that had previously been approved pursuant to the provisions of R.S. § 2103 (25 U.S.C. § 81), and inquiry made at the Solicitor's direction disclosed that the present case represented the first instance of an attempt by the Secretary to cancel such a previously approved contract.

44. Solicitor Barry reported to the Secretary on November 1, 1963, that "Mr. Littell's conduct must be characterized as contrary to and inconsistent with his responsibilities as the Tribe's attorney."

45. The defendant Secretary had determined as early as October 11, 1963, that the plaintiff "had been guilty of gross misconduct, and that he should be removed, * * * and the policy of the Department was that we had a lawyer who had been dishonest and we were going to remove him, and this is what we undertook to do."

46. The defendant Secretary testified at the trial that, "As far as Mr. Littell is concerned, unofficially from the 11th [of October], and officially from the first of November, it is our judgment that he had been unethical and dishonest and that he could no longer serve the Tribe, and it has been our policy to get him out."

47. In view of the facts set forth in the preceding three findings, neither the Secretary's suggestion to the plaintiff on November 1, 1963, that he present to the Solicitor "any evidence which you have by way of explanation or exculpation," nor the Solicitor's written questions to the plaintiff on November 7, 1963, were submitted with any expectation that the plaintiff would alter the conclusions that the Secretary and the Solicitor had already reached.

48. Plaintiff could not in point of actual fact have obtained relief from his suspension within the Department of the Interior after November 1, 1963.

## C. THE CHARGES MADE AGAINST THE PLAINTIFF

(1) *Charges arising out of plaintiff's increase in compensation effected by Amendment No. 9 to his contract.*

49. Paragraph 4 of the plaintiff's existing contract, dated August 8, 1957, provided for his compensation as General Counsel at the rate of $25,000 annually. This paragraph was approved by the delegate of the Secretary of the Interior on condition that the plaintiff's compensation be not changed during the first five years of the contract.

50. Contrary to the prohibition contained in paragraph 4(a) of the 1957 contract "that there shall be no change in the compensation of Mr. Littell and Mr. Alexander during the first five years of this contract," the plaintiff's compensation was increased from $25,000 per annum to $35,000 per annum by Amendment No. 9, executed August 1961, and approved by the Secretary December 22, 1961. Although Amendment No. 9 was authorized by a resolution of the Navajo Tribal Council by a vote of 65 to 1,

adopted June 30, 1961, the evidence established that the members of the Tribal Council were not informed by plaintiff or other associate counsel during debate or discussion of the resolution of the prohibition contained in paragraph 4(a) of the 1957 contract, which precluded a change in plaintiff's compensation until August 1962.

On June 30, 1961, while the plaintiff was in Turkey, the Navajo Tribal Council considered an increase in his compensation. He advised the Council by cable that, "I will leave compensation to Council as always." The plaintiff authorized no one to represent that the five year period had expired.

The plaintiff, when questioned about this matter, stated that "it is a matter of some concern to me."

51. On August 14, 1961, the foregoing increase in plaintiff's compensation was incorporated into Amendment No. 9 to his contract, which was then submitted to the Department of the Interior for approval. On September 7, 1961, the Chairman of the Navajo Council submitted a memorandum justifying the increase, and on October 27, 1961, the plaintiff submitted to Solicitor Barry a further memorandum regarding the increase. Both were considered by the Department of the Interior.

52. On December 22, 1961, the defendant Secretary personally approved the foregoing amendment stating that "I find it to be in the best interest of the Indians." Three years later, testifying in this cause, he characterized his approval as "a form letter" which he signed "as a matter of course," as "a perfunctory form," and as "entirely routine matter."

53. Amendment No. 9 was not mentioned in Solicitor Barry's October Memorandum, nor was it referred to by the defendant Secretary in his conference with the plaintiff on October 11, 1963.

54. Amendment No. 9 was mentioned only in the second or "Confidential" November Memorandum, wherein it was asserted that the plaintiff "has ardently advocated increases in his retainer," that the minutes of the Tribal Council meeting at which Amendment No. 9 was considered "do not show that it was explained to the Tribal Council that this provision of his contract required of him, as a matter of law, to work for $25,000 per year for five years," and that "it was represented on his behalf that the five-year period had expired."

55. There was nothing before the Department of the Interior in November 1963, regarding Amendment No. 9 to the plaintiff's contract that had not been before it in December 1961, when that Amendment was approved by the defendant Secretary.

*(2) Use of General Counsel Attorneys on Claims Cases*

56. The basic Tribal Attorney contract requires the performance of two types of legal services—General Counsel services which are compensated by retainer sum and "Claims" services which are to be compensated by a percentage of the recovery. No less than seven amendments to the plaintiff's contract specifically provided that lawyers named therein as subordinates to the plaintiff and employed on behalf of the Navajo Tribe of Indians were to be so employed but "not in any respect whatever pertaining to claims."

57. Such restrictions were lifted as of July 22, 1960, in respect of plaintiff's assistants, Joseph F. McPherson and Walter F. Wolf, Jr., by the Solicitor of the Interior Department acting on behalf of the Secretary, in pursuance of the provisions in the plaintiff's contract. This removal of restrictions had been approved by the Navajo Tribal Council. Thereafter, in 1961, Amendment No. 8 to the plaintiff's contract, providing for the substitution of McPherson as Claims Attorney in the event of the plaintiff's disability, etc., was adopted and approved.

58. Certain legal problems of the Navajo Tribe of Indians under plaintiff's care had from time to time both "claims" and "general counsel" aspects. Thus, the dispute of the Navajo Tribe with the

Hopis was considered a general counsel case while administrative solution was sought in the Department of the Interior. When no settlement could there be reached and Congressional authorization for suit was enacted and the cause Healing v. Jones was instituted, the plaintiff contended that the case became a c'aims case. Similarly, the school section problem involved some 90 to 94 sections of land, all general counsel work. Of these sections of land, two only were involved in a dispute which assumed a claims character in plaintiff's view. The point at which plaintiff contends that the claim commenced in this instance was when the Navajo Tribe appealed to the Secretary of the Interior from a successful application by the State of Utah for a patent to the two sections in land proceeding Utah 030009.

59. Plaintiff encountered shortages in legal personnel and difficulty in training young lawyers coming to Window Rock, Arizona, in the intricacies of Indian law and Indian affairs. The plaintiff has sometimes used and condoned the use of general counsel attorneys on claims litigation.

60. In his October Memorandum, Solicitor Barry stated that "Any contingent fee due under the contract would be subject to offset so as to reimburse the tribe for any unauthorized payments made to general counsel staff attorneys for claims work." In his two November Memoranda, Solicitor Barry set forth the plaintiff's use of general counsel attorneys on claims cases as grounds for terminating the plaintiff's contract.

61. Both of Solicitor Barry's November Memoranda on the subject of the use of general counsel attorneys on claims cases rested on his conclusion that, as a matter of law, "The General Counsel is obligated to provide, at his own expense, any other attorneys which are required for claims work under the Contract."

62. Insofar as the charge that the plaintiff improperly used general counsel attorneys on claims work involved their participation in Healing v. Jones that charge was inconsistent in fact with the further charge that the plaintiff improperly classified Healing v. Jones as a claims case.

62A. In view of the circumstances that the plaintiff has yet to submit a bill for services in Healing v. Jones, that the Tribe's governing body, the Navajo Tribal Council, has never complained of any irregularities in respect of the use of general counsel attorneys on claims work in the 20 months that have elapsed since those charges were first made by the Advisory Committee, and that a determination of whatever setoff or reimbursement may be due by reason of such use involves not only the examination of voluminous service records but also the separation of the entires thereon into claims and general counsel aspects of the several cases, no findings are being made concerning the extent of such use.

(3) *Classification of Healing v. Jones, made by Amendment No. 11.*

63. On August 11, 1960, Undersecretary of the Interior Elmer Bennett requested Joseph F. McPherson, one of the plaintiff's assistants, to have the Chairman of the Navajo Tribal Council write the Department to obtain a definition of "claims" and a determination by the Department of which cases filed or contemplated were to be considered as claims within the meaning of the plaintiff's contract. Chairman Paul Jones wrote to the Secretary of the Interior on August 25, 1960; his letter (Plaintiff's Exhibit F), which specifically mentioned the case of Healing v. Jones, is incorporated into these findings by reference.

64. On November 15, 1960, Solicitor Theodore F. Stevens replied to Chairman Jones, setting forth reasons why, in his opinion, Healing v. Jones was not a claims case within the meaning of plaintiff's contract. On December 6, 1960, the plaintiff, to whom Solicitor Stevens had sent a copy of the foregoing letter to Chairman Jones, wrote to the Solicitor, setting forth reasons why, in his opinion, Healing v. Jones was a claims case under his attorney contract. Both letters (Plain-

tiff's Exhibit G and H) are incorporated into these findings by reference.

65. Thereafter, the plaintiff furnished Solicitor Stevens with the minutes of the Navajo Tribal Council's Advisory Committee meeting of September 24, 1957, after which, on January 19, 1961, the Solicitor replied to the plaintiff, saying, "The minutes clearly show that at the negotiation of the contract the tribe and you specifically discussed the Hopi case as being a claims matter within the claims provision of your contract. As regards the school land section cases, we are persuaded for the reasons set forth in your letter that they also constitute claims work under your contract." Solicitor Stevens' second opinion and the Advisory Committee minutes on which he relied (Plaintiff's I and K) are incorporated into these findings by reference. The original minutes were returned to the plaintiff by the Solicitor's office in March 1961.

66. Solicitor Stevens' reference to "the negotiation of the contract," quoted in the preceding finding, requires examination of the events of 1957. On August 7, 1957, the last day that plaintiff's 1947 contract was in effect, the Navajo Tribal Council by a vote of 69 to 0 authorized its Advisory Committee to negotiate a new contract. The terms of that new contract were discussed with the Advisory Committee at its September 24, 1957, meeting, which was attended also by J. Warren Spaulding, Superintendent of the Navajo Agency under the Bureau of Indian Affairs, and by J. Maurice McCabe, Executive Secretary of the Navajo Tribe. At that meeting the plaintiff disclosed, fully and frankly, that the Navajos' dispute with the Hopis would become a claims case once the litigation that was contemplated had been authorized by Congress, and that he would then in the event of success become entitled to 10% of the value of recovery under the provisions of his contract, or, alternatively, in order to preclude too large a fee, to such a percentage of royalties, bonuses and income derived from the recovered property, not to exceed 1% thereof, as would be agreed upon by the parties and approved by the Commissioner of Indian Affairs.

66A. Amendment No. 11 to plaintiff's contract was dated April 20, 1962, and was executed pursuant to a resolution of the Navajo Tribal Council that was adopted on February 22, 1962, by a vote of 63–4. While Amendment No. 11 was under consideration in the Department of the Interior, Solicitor Barry requested and received additional data from the plaintiff. Thereafter, Solicitor Barry noted his personal concurrence in the proposed approval of Amendment No. 11, which was thereupon approved by Assistant Secretary Carver on July 6, 1962.

67. Amendment No. 11, already incorporated by reference herein, had four principal provisions: (a) It retained Leland O. Graham to perform general counsel and claims services in Washington; (b) It raised the salary of Robert J. Walton at Window Rock; (c) It amended the language of the original contract; (d) It listed Healing v. Jones, before the three-judge court, and Navajo Tribe v. State of Utah, before the Secretary of the Interior as Utah 030009, as claims cases within the contract. The authorizing resolution did not cover items (c) or (d).

68. For several years prior to 1963, the plaintiff had repeatedly disclosed and reaffirmed to the Navajo Tribal Council, his client's governing body, that he regarded Healing v. Jones as a claims case, and it is reasonable to conclude that the Tribal Council understood in consequence of this that he was entitled under the terms of his contract either to 10% of the value of recovery therein or to a percentage not to exceed 1% of such royalties, bonuses, and income as might be obtained from the recovered lands.

68A. DeRose, whose legal views regarding Healing v. Jones were set forth in the original charges made against the plaintiff in respect of Amendment No. 11 by the Advisory Committee in June 1963, did not know that that amendment had been reviewed and approved by Solicitor Barry, and had not read either

the Healing v. Jones opinion reported at 174 F.Supp. 211 nor that reported at 210 F.Supp. 125.

69. Discussing Healing v. Jones in his October Memorandum, Solicitor Barry said, "Following an unsuccessful challenge to the jurisdiction of the court, the United States then took the position of stakeholder", that "In the litigation, the United States * * * asserted no position as against either party which placed either party in the position of prosecuting a claim against the United States," and that "The only obstacle to the successful assertion of either tribal claim was the opposing claim of the other." Language similar to that just quoted appeared in Solicitor Barry's first November Memorandum.

70. None of the Barry Memoranda cited the opinion reported as Healing v. Jones, 174 F.2d 211 (D.Ariz.).

71. In his first November Memorandum, Solicitor Barry said of the Stevens opinion of January 19, 1961, that "the reason given for his conclusion was that during the negotiation of the contract the Hopi case was discussed as being a claims matter. Mr. Stevens evidently relied on statements in Mr. Littell's letter. The Minutes of the Tribal Council meeting, however, at which the contract was approved, show that no consideration whatsoever was given to this matter."

72. Apart from the charges drafted by Leo Denetsone and Barry DeRose that were adopted by the Advisory Committee on June 25, 1963, there was nothing concerning Amendment No. 11 and the classification of Healing v. Jones as a claims case that was before or otherwise available to Solicitor Barry and the defendant Secretary on October 11, and November 1, 1963, that was not equally available to and otherwise before Solicitor Barry and Assistant Secretary Carver in July 1962, when the latter two joined in approving Amendment No. 11.

73. Some at least of the Navajo Tribal Council and Advisory Committee minutes that reflected the plaintiff's disclosure of his views regarding the status of Healing v. Jones and the consequent potential recovery to him were before Solicitor Barry in October and November 1963.

74. The plaintiff has neither formulated the fee due him in respect of the final outcome of Healing v. Jones, nor negotiated such fee with the Navajo Tribal Council, nor presented a voucher concerning such fee under the provisions of R.S. § 2104 (25 U.S.C. § 82).

74A. Although plaintiff has not submitted vouchers for compensation for any claims cases and has not received any fees for claims work on which he has been engaged during the past 17 years, the Tribe has made available over $700,-000 which has been disbursed under plaintiff's authority for expenses in preparing and prosecuting claims cases. In addition, the Tribe has paid for the services of a full-time secretary in the plaintiff's Washington office and a part-time secretary.

75. John S. Boyden, Esq., who was counsel for the Hopi tribe in Healing v. Jones, and who had both claims and general counsel contracts with that tribe, advised the Hopi Tribal Council that Healing v. Jones was a claims case. His fee for services in that matter has not yet been submitted to the Secretary of the Interior.

(4) *Other charges first made against the plaintiff at the trial.*

76. DeRose and Genevieve Denetsone charged at the trial that plaintiff was always fighting everyone, naming industry, labor, the banks, and States of the Union. Analysis of the matters handled by the plaintiff on behalf of the Navajo Tribe shows that, in furtherance of the Tribe's interests, he either litigated or negotiated on its behalf, with or against power companies, oil and gas companies, local banks, labor unions, and, in matters involving jurisdiction over Navajo Indians, State courts and agencies.

77. At the trial, the defendant Secretary asserted that the plaintiff was

"adroit" in getting matters through the Department of the Interior, and charged that he "sneaked papers through the Department."

78. In view of the numerous documents considered over a long period of time in connection with (a) the increase in plaintiff's retainer effected by Amendment No. 9, (b) the authorization to employ McPherson and Wolf on claims cases, (c) the classification of Healing v. Jones by the Department of the Interior as a claims case, and (d) the approval of Amendment No. 11, the number of persons who reviewed and approved each matter prior to approval, and the complete absence of any evidence in the record that plaintiff acted other than with complete propriety in obtaining Departmental approval in these four matters, the defendant Secretary's charges, made on the witness stand, that the plaintiff was "adroit" or "sneaky," are groundless in point of fact.

79. The record in this case, which includes (a) the record made on the motion for preliminary injunction that was before the Court of Appeals in Udall v. Littell, 338 F.2d 537, (b) the record made on the motion to cite the defendant Secretary and two of his subordinates for contempt, (c) the record made on the defendant Secretary's motion to "clarify" the preliminary injunction, and (d) the testimony and the exhibits adduced in the course of a trial that lasted for two full weeks, does not contain a single complaint at any time by the defendant Secretary, by Solicitor Barry, by Chairman Nakai, by the Denetsones, by Barry DeRose, or by anyone else, of any lack of professional competence on plaintiff's part in any matter in the course of his representation of the Navajo Tribe of Indians over the seventeen and a half years during which he has acted as their General Counsel and Claims Attorney.

80. During the seventeen and a half years that the plaintiff, Norman M. Littell, has acted as the General Counsel and Claims Attorney of the Navajo Tribe of Indians, he has at all times represented his client competently, faithfully, loyally and honestly.

81. The conclusions reached by the Court at the close of the contempt hearing, that the plaintiff is "a man of outstanding integrity and character," and that he is "an outstanding lawyer," have not been altered by any of the testimony adduced against him at the trial, but have on the contrary been in every respect confirmed.

## D. PERTINENT EVENTS SUBSEQUENT TO TERMINATION

82. On November 1, 1963, pursuant to orders from the defendant Secretary and Solicitor Barry, Zimmerman was sent to the Navajo Indian Reservation to obtain additional evidence to fortify the conclusions that the first two named had already reached.

83. From November 2 through November 15, Zimmerman rummaged at will through the files of the Legal Department of the Navajo Tribe at Window Rock, Arizona, eventually removing entire file cabinet drawers to the home of Chairman Nakai. Among the documents he took were personal papers, such as check books, tax returns, and automobile registrations, belonging to Executive Secretary J. McCabe, and an entire file containing memoranda passing between the members of the Navajo Tribe's Legal Department relating to the strategy to be employed by them in the case of Navajo Tribe v. State of Utah that was then pending before the Department of the Interior as Utah 030009.

84. A voluminous mass of documents taken and carried away by Zimmerman from the Navajo Tribe's Legal Department files were offered in evidence as Defendant's Exhibits 4–8 and 14–17.

85. On November 1, 1963, the defendant Secretary advised Chairman Nakai of the action he had taken on that day with respect to the plaintiff. On November 15, 1963, the Advisory Committee of the Navajo Tribal Council voted to put the matter of the plaintiff's contract on the agenda for the Tribal Council meeting scheduled for December 9. Around

November 23, Chairman Nakai circulated a "White Paper" on the Navajo Indian Reservation in which he reviewed the charges that the Advisory Committee had adopted on June 25, 1963, as well as the charges of contentiousness that DeRose and Genevieve Denetsone later made from the witness stand, and in which he expressed the opinion regarding the plaintiff that "his usefulness as General Counsel to the Navajo Tribe is at an end." This "White Paper" was drafted with the assistance of Area Operations Officer Robert W. Young and Area Director F. M. Haverland of the Bureau of Indian Affairs.

86. Some time between November 15 and December 9, 1963, Chairman Nakai changed his mind regarding the desirability of discussing the plaintiff's contract before the Navajo Tribal Council, and Harold E. Mott, a Washington lawyer without prior experience in Indian matters, appeared in Window Rock to assist him in keeping the plaintiff's contract off the agenda.

87. A new agenda for the December 9, 1963 Tribal Council meeting, which did not include any discussion of plaintiff's contract, was then prepared. Zimmerman was sent to Window Rock by Solicitor Barry, with the knowledge and acquiescence of the defendant Secretary, to observe the meeting and to convey the Secretary's views regarding plaintiff's contract. When Zimmerman arrived, he conferred with Mott and Chairman Nakai.

88. When the Navajo Tribal Council met on December 9, 1963, it was attended by Zimmerman, Mott, and no less than four other representatives of the Bureau of Indian Affairs, all of whom, including Mott, sat in or near the places customarily reserved at Tribal Council meetings for Government personnel. This was a larger attendance of Bureau representatives than usual.

89. When some members of the Navajo Tribal Council asked who Mott was, Chairman Nakai at first refused to say. Later he said that Mott was there as his personal attorney.

90. Before, after, and during recesses in the course of the meeting of the Navajo Tribal Council that began on December 9, 1963, Mott walked back and forth between the Council Chamber Building and the Administration Building with the group that consisted of Zimmerman and the representatives of the Bureau of Indian Affairs. During the session, Mott frequently signalled Chairman Nakai concerning the latter's rulings.

91. During the course of the meeting of the Navajo Tribal Council that began on December 9, 1963, Chairman Nakai consistently ruled out of order any and all discussion of the plaintiff's contract, and permitted that subject to be discussed only on an off-the-record basis. This latter feature represented a sharp departure from the customary practice at Tribal Council meetings.

92. On December 10, 1963, Chairman Nakai ordered the plaintiff to leave the Navajo Tribal Council meeting, and directed the sergeant-at-arms to remove him if necessary. Plaintiff then left the meeting. During the process of ejection, Zimmerman and the Bureau of Indian Affairs representatives sat by silently. The members of the Tribal Council regarded this silence as tantamount to approval, inasmuch as in the past Bureau representatives had always injected themselves into the discussion whenever they considered that an irregularity was taking place.

93. On December 11, 1963, after plaintiff had been ejected from the Council Meeting, Zimmerman said to Councilwoman Wauneka, in substance, "Now you see that the Secretary of the Interior cannot be pushed around."

94. After Zimmerman's return to Washington following the foregoing incidents, he reported his activities to his superiors.

95. The next meeting of the Navajo Tribal Council commenced January 27, 1964. The plaintiff attended. On February 3, 1964, Chairman Nakai once more ordered the plaintiff from the Council Chamber under threat of physical ejection, and plaintiff left.

96. The plaintiff thereupon brought an action against Chairman Nakai in the United States District Court for the District of Arizona to restrain further interference with the performance of his contract, by way of ejection from meetings of the Navajo Tribal Council and otherwise, and obtained a temporary restraining order against further ejection on February 11, 1964. Under cover of that restraining order, plaintiff attended further sessions of the Navajo Tribal Council, and reported to the Council on some of the many complex legal problems that were then before them for action.

97. After the plaintiff obtained the temporary restraining order mentioned in the preceding finding, the Department of the Interior requested the Department of Justice to intervene on behalf of Chairman Nakai, and to assert an interest of the United States in preventing intrusion into the internal affairs of Indian tribes. A representation of interest was accordingly filed, and on the hearing of plaintiff's motion for a preliminary injunction the entire cause was dismissed for want of jurisdiction on the strength of that representation.

98. Plaintiff appealed the dismissal to the United States Court of Appeals for the Ninth Circuit. The case was affirmed.

99. On December 16, 1963, plaintiff moved to cite the defendant Secretary and Zimmerman for contempt, asserting that their actions in connection with plaintiff's December 1963 ejection from the meeting of the Navajo Tribal Council involved a violation of paragraph 2 of the preliminary injunction in this case. When that motion came on for trial, in March 1964, plaintiff amended his motion to include the events arising out of the second ejection, and to add Solicitor Barry as a party respondent.

100. On March 24, 1964, following a five day trial of the motion to adjudicate in contempt, the Court said, referring to the officers of the Interior Department, "I think that they realize they were wrong, and that this ought to stop, and give our Court of Appeals an oppor-

tunity to decide this case on the merits," following which the Court on April 6, 1964, entered an order denying the motion to adjudicate the defendant Secretary and the respondents Barry and Zimmerman in contempt reciting in pertinent part, "the Court having concluded that the evidence is not sufficiently clear and convincing for the Court to determine that a contempt of its preliminary injunction was intended by the defendant or the respondents." The opinion and order are incorporated by reference.

100A. At the time of the hearing on the motion to adjudicate in contempt, the Court was not aware that it was the view of the defendant Secretary that "As far as Mr. Littell is concerned, unofficially from the 11th [of October], and officially from the first of November, it is our judgment that he had been unethical and dishonest and that he could no longer serve the Tribe, and it has been our policy to get him out."

101. At the Navajo Tribal Council meeting in May 1963, there was authorized Amendment No. 13 to the plaintiff's contract, which provided salary increases for five of the plaintiff's assistants. This amendment was executed on June 30, 1963, and on August 20, 1963, it was forwarded to the Department of the Interior by Area Director Haverland with a recommendation for approval.

102. On December 4, 1963, Chairman Nakai wrote the Commissioner of Indian Affairs, urging approval of Amendment No. 13. On March 5, 1964, Area Director Haverland again urged approval of Amendment No. 13, except its paragraph 4, which read, "The Attorney Contract, as amended, between the Tribe and the Attorneys shall remain in full force and effect except as amended herein." A similar provision had been in each of the twelve earlier amendments to the plaintiff's contract.

103. In view of the circumstances that Amendment No. 13 had been executed long before there was any controversy over the Secretary's power to terminate the plaintiff's basic contract, that its paragraph 4 contained language that in

substance had been included in each of the twelve prior amendments, and that its approval with a specific reservation as to that paragraph had been recommended by the Area Director, the Secretary's complaint on the stand that it contained "tricky language" is without foundation.

104. At the time of the trial, which was 19 months after the date of its execution, and 17 months after it was first forwarded from the field with the Area Director's recommendation for approval, Amendment No. 13 was still in the Solicitor's Office. It had never been presented to the defendant Secretary or to his delegate for approval or disapproval, and neither the defendant Secretary nor any delegate of his had either approved it or disapproved it or conditionally approved it.

105. The Interior Department has failed to act on Amendment No. 13 under R.S. § 2103 (25 U.S.C. § 81) over this long period. Every attorney whose salary would have been increased by its provisions has resigned.

106. In consequence of these resignations, the Legal Department of the Navajo Tribe of Indians has been virtually destroyed. Since November 1, 1963, the Department of the Interior has ceased communications with the plaintiff, and many classes of matters pertaining to the legal aspects of the affairs of the Navajo Tribe of Indians about which the plaintiff had been routinely consulted prior to that date have since that date no longer been referred to him.

107. The Secretary has contributed to the almost total destruction of the Navajo Tribe's Legal Department and the isolation and circumvention of the plaintiff as its general counsel as a result of the defendant Secretary's announced "policy to get him out."

### E. NON-PAYMENT OF PLAINTIFF'S VOUCHERS

107A. Paragraph 4a of the Attorney Contract provides that the plaintiff, as General Counsel for the Navajo Tribe, "shall be paid an annual compensation out of funds of the Navajo Tribe." Paragraph 3 of Amendment No. 6 to the Attorney Contract provides as follows:

"The said General Counsel services are to be rendered on an annual basis, but compensation to be paid therefore as hereinabove provided, shall be paid for the convenience of all parties *in accordance with the payroll practices of the Navajo Tribe,* but in not less than twelve equal installments on the first day of each month, commencing September 1, 1957." (Emphasis supplied.)

108. During the year 1962, and in 1963, prior to the defendant Secretary's action of November 1, 1963, plaintiff's monthly retainer vouchers were paid promptly after submission. The practice was for the plaintiff to mail them to Window Rock, where they would be submitted to and approved by the Chairman of the Navajo Tribal Council, after which a check was drawn by the Tribal treasurer on Tribal funds in a local bank, and mailed to the plaintiff in Washington. Through all of 1962 and through 1963, prior to November 1 of that year, the average elapsed time between the date plaintiff's monthly retainer voucher was mailed from Washington and the date that payment therefor was received was 17 days.

109. When the defendant Secretary purported to suspend the plaintiff on November 1, 1963, he specifically directed that no further payments be made to him, as recommended by Solicitor Barry. Paragraph 3 of the preliminary injunction of November 29, 1963, accordingly prohibited the defendant Secretary from stopping or preventing the ordinary course of payments to the plaintiff, including sums due for services performed under his contract during the months of September and October 1963. The vouchers covering plaintiff's services for those months were later approved by the defendant Secretary, and were paid after an elapsed time of 161 and 100 days respectively.

110. Thereafter, Chairman Nakai and Leo Denetsone held plaintiff's monthly

service vouchers as they were submitted, without taking any action thereon. None of the plaintiff's retainer vouchers were ever returned to him for corrections or for additional data. Considerable correspondence between plaintiff's counsel and counsel for the defendant Secretary proved unavailing. Some time in August 1964, Nakai turned over all the unpaid vouchers to Superintendent Landbloom, without taking action either to approve or disapprove them, after which Landbloom forwarded them to the Department of the Interior. When plaintiff's counsel then made further inquiry of counsel for the defendant Secretary regarding those vouchers, the latter responded by filing a motion for clarification of the injunction.

111. In his motion to "clarify" the injunction, the defendant Secretary sought leave of this Court to return to Chairman Nakai for action by him retainer vouchers that had been submitted by the plaintiff over a period of more than seven months during which Chairman Nakai had taken no action thereon. On October 30, 1964, Judge McGarraghy denied the motion.

112. Thereupon, the defendant Secretary advised Chairman Nakai he saw no reason why the vouchers should not be approved, and on November 27, 1964, the plaintiff received payment in respect of nine monthly retainer vouchers that had been held for periods ranging from 324 to 105 days.

113. It was shown at the hearing before Judge McGarraghy on the defendant Secretary's motion to clarify that, on December 22, 1953, the Bureau of Indian Affairs had promulgated instructions governing Accounting Procedures, which provided in Section 606.11 C(4) (a) that "Payments of attorneys' fees or compensation do not require tribal approval."

114. On December 31, 1964, the plaintiff received payment for five additional monthly retainer vouchers, which had been held for from 107 days to only 1 day. The schedule showing the dates of the submission and payment of plaintiff's vouchers from January 1962 through January 1965, is incorporated into these findings by reference.

115. Letters and memoranda emanating from members of the Department of the Interior reflect a persistent purpose to obstruct, at least to the extent that the terms of the preliminary injunction permitted, the payment of the plaintiff's retainer and expense vouchers.

116. The Court finds that, unless the defendant Secretary and his subordinates are appropriately restrained and enjoined by injunction, they will probably continue to interpose obstacles and delays, either directly or indirectly, to the prompt payment of plaintiff's expense and retainer vouchers.

### F.   CHANGES IN TRIBAL ORGANIZATION

117. As has been noted, the Advisory Committee was reconstituted in the Fall of 1964 to consist of 18 members selected by the Navajo Tribal Council. At the same time, the post of Executive Secretary was abolished, and its last incumbent, J. Maurice McCabe, was selected by the Navajo Tribal Council to be Director of Administration.

### G.   COMPETENCE OF TRIBAL COUNCIL

118. Mrs. Annie Wauneka, a distinguished Indian leader whose dedication to the welfare of the Tribe has been recognized by the President of the United States by his awarding to her the Medal of Freedom, is a member of the Tribal Council. The wisdom, honesty, sincerity and judgment manifested by her while she was testifying in the contempt proceeding and also in this action and also that of Mr. McCabe, the Director of Administration for the Tribe, has greatly impressed the Court. The Court chooses to give more weight to their testimony than it does to that of the Secretary, Barry, DeRose, and the Denetsones, and particularly with reference to their testimony regarding the ability of the Tribal Council to conduct its own affairs and make its own decisions. Mr. McCabe, who has attended practically

every Tribal Council meeting since July, 1951, expressed confidence in the ability of the Council members to handle their own affairs. He testified that a few of the matters the Council has considered and resolved included the development of mining regulations, grazing regulations, and trading post regulations, and the preparation of an annual Tribal budget.

Mrs. Wauneka has been a Council member since 1951 and the Court has already commented upon her credibility as a witness. She testified that the Council members are "able and capable of handling the Tribal affairs to may way of thinking."

The Court finds from the evidence that the Tribal Council has the ability, knowledge, and intelligence to handle its own affairs.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the cause of action.

2. This is not an action against the United States.

3. The Navajo Tribe of Indians is not a necessary party to this action.

4. Since the plaintiff's contract here was terminable only by the Navajo Tribal Council, it could not be terminated by or at a tribal election, even if such election had been a plebiscite.

5. The action taken by the defendant Secretary on November 1, 1963, and the further action imminently threatened to be taken by him, violated the rights of the plaintiff under his approved contract with the Navajo Tribe of Indians, and are in excess of any power or authority vested in the defendant Secretary by law.

6. The defendant's authority and duty to exercise supervision over Indian affairs authorizes him to supervise plaintiff's performance under the contract with the Navajo Tribe and the defendant should not be enjoined from continuing to discuss plaintiff's activities and performance with tribal officials, with employees and officials of the Bureau of Indian Affairs and the Department of the Interior.

7. By virtue of 25 U.S.C. § 82, plaintiff may not receive payment of either the installments due on his annual retainer and expenses as General Counsel or for fees which he may have earned or which he may earn by work on claims cases except upon approval of such vouchers by the Secretary of the Interior, the Commissioner of Indian Affairs, or other authorized delegate.

8. There was no administrative remedy available to the plaintiff.

9. Notwithstanding the five year limitation imposed on changes in the plaintiff's compensation when his 1957 contract was originally approved, the parties were free as a matter of law to waive that limitation provided such waiver was approved pursuant to R.S. § 2103 (25 U.S.C. § 81).

10. Even if the Secretary had power as a matter of law to terminate the plaintiff's contract for good cause shown, the charges made against the plaintiff in connection with the adoption of Amendment No. 9 would not have constituted good cause for termination.

11. Under the facts in this case, plaintiff's use of general counsel attorneys on claims matters in furtherance of the interests of the Navajo Tribe of Indians was not good cause for terminating his contract with that Tribe, even if the Secretary had power as a matter of law to terminate the plaintiff's contract for good cause shown.

12. To the extent that the Navajo Tribe of Indians is entitled to compensation by reason of any irregularity in the use of general counsel attorneys on claims cases, either by way of setoff or reimbursement, its interests will be amply and adequately protected if such compensation is reflected in the ultimate fixing of the fees due the plaintiff when his claims work has been successfully concluded, as indeed the Solicitor suggested in October 1963.

13. The status of Healing v. Jones as a claims case or otherwise depends on

the terms of plaintiff's 1957 contract. If, as a matter of law, it was a claims case under the terms of that contract, then no further authorizing resolution by the Navajo Tribal Council was required to make it such.

14. Neither the plaintiff's part in negotiating and then obtaining approval of Amendment No. 11, nor his consistent assertion that Healing v. Jones was a claims case within the meaning of his contract, involved either overreaching or unethical conduct on his part as a matter of law.

15. At its very weakest for the plaintiff's position, the status of Healing v. Jones as a claims case or otherwise, was a debatable question on which reasonable lawyers might differ, and hence the plaintiff's insistence that it was a claims case, particularly after he had persuaded Solicitor Stevens to adopt that view after first rejecting it, did not as a matter of law justify the assertions against the plaintiff, in the October and November Memoranda and at the trial, that in so classifying that case he had been guilty of improper conduct.

16. Consequently, even if the defendant Secretary had power as a matter of law to terminate the plaintiff's contract for good cause shown, neither the plaintiff's part in the negotiation and adoption of Amendment No. 11 nor his insistence that Healing v. Jones was a claims case would have constituted good grounds for such termination.

17. Even if the defendant Secretary's allegation that the plaintiff has unclean hands were well pleaded, it fails here, because the evidence here fails utterly to prove the allegation made.

18. It is the legal right and duty of the plaintiff to be present at meetings of the Navajo Tribal Council.

19. Paragraph 3 of the preliminary injunction must be continued in order to insure that the defendant Secretary will not, either by collaboration with Chairman Nakai or by action parallel to that taken by the latter, prevent the payment of the retainer fees due plaintiff under his contract, with the performance of which the defendant Secretary has been forbidden to interfere.

20. Neither paragraph 3 of the preliminary injunction nor any provision of the permanent injunction to be entered here that is similar in substance thereto improperly directs the payment of funds of the United States.

21. In view of the manner in which Chairman Nakai and members of the Department of the Interior, by concerted or parallel action and inaction have in fact delayed the payment of the plaintiff's retainer and expense vouchers, plaintiff should no longer be required to follow "the payroll practices of The Navajo Tribe," as provided in paragraph 4(a) of his contract amended by Amendment No. 6.

22. Instead, the permanent injunction should provide that, if no action has been taken on plaintiff's retainer or expense vouchers by the authorized certifying officer of the Navajo Tribe of Indians within 30 days after receipt thereof, then the defendant Secretary shall process such vouchers in accordance with the terms of Section 606.11C (4) (a) of the Indian Affairs Manual and the provisions of the Department of the Interior and Related Agencies Appropriation Act, 1965, Public Law 88–356, 78 Stat. 273, 275 (Tribal Funds) and similar future legislation.

23. The plaintiff will suffer irreparable injury unless a permanent injunction is issued as prayed to restrain the defendant Secretary from accomplishing and continuing his interference with the plaintiff's said contract with the Navajo Tribe of Indians.